UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ANDRE JAMAL ROBINSON,

        Plaintiff,

    v.

MATTHEW CATE, et al.,

        Defendant.

No.  2:11-cv-02555 MCE AC P

FINDINGS AND RECOMMENDATIONS

I.     Introduction

      Plaintiff is a state prisoner currently incarcerated at the Sierra Conservation Center (SCC), under the authority of the California Department of Corrections and Rehabilitation (CDCR). Plaintiff proceeds pro se and in forma pauperis in this civil rights action filed pursuant to 42 U.S.C. § 1983.  This action proceeds on plaintiff's First Amended Complaint (FAC) filed March 27, 2013, against defendant George J. Giurbino, former Director of CDCR's Division of Adult Institutions.  See ECF No. 36; see also ECF Nos. 44, 45 (dismissing defendant Matthew Cate, former Secretary of CDCR, and directing defendant Giurbino to file an answer to the FAC).

      Plaintiff, a practicing Muslim, challenges the Religious Meat Alternate Program (RMAP) provided by CDCR, as implemented by a March 18, 2010 memorandum authored by defendant Giurbino (the Giurbino Memorandum).  Plaintiff contends that the RMAP fails to provide him and other Muslim inmates with a fully Halal diet that is comparable to the fully Kosher diet

1

1  provided to Jewish inmates through CDCR's Jewish Kosher Diet Program (JKDP).  Plaintiff

2  contends, alternatively, that he and other Muslim inmates should be permitted to participate in the

3  JKDP due to similarities in Halal and Kosher foods.  Plaintiff asserts claims under the First

4  Amendment's Free Exercise and Establishment Clauses, the Fourteenth Amendment's Equal

5  Protection Clause, and the Religious Land Use and Institutionalized Persons Act (RLUIPA).

6          Defendant moves for summary judgment on the substance of plaintiff's legal claims and

7  on grounds that defendant was not personally involved in the alleged violation of plaintiff's rights

8  for purposes of an individual capacity suit; that defendant is immune from suit in his official

9  capacity under the Eleventh Amendment; and defendant is entitled to qualified immunity.

10  Plaintiff filed an opposition to the motion for summary judgment; defendant filed a reply and a

11  supplemental brief.[1]

12          This action is referred to the undersigned United States Magistrate Judge pursuant to 28

13  U.S.C. § 636(b)(1)(B), Local Rule 302(c), and Local General Order No. 262.  For the reasons that

14  follow, this court recommends that defendant's motion for summary judgment be granted in part

15  and denied in part.

16      II.      Legal Standards for Summary Judgment Motions

17          Summary judgment is appropriate when the moving party "shows that there is no genuine

18  dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

19  Civ. P. 56(a).  Under summary judgment practice, the moving party "initially bears the burden of

20  proving the absence of a genuine issue of material fact."  Nursing Home Pension Fund, Local 144

21  v. Oracle Corp. (In re Oracle Corp. Securities Litigation), 627 F.3d 376, 387 (9th Cir. 2010)

22

23  [1]  Defendant filed his motion for summary judgment on February 13, 2015.  ECF No. 72.
    Following extensions of time, plaintiff filed his opposition on May 22, 2015.  ECF No. 79.
24  Defendant filed his reply on June 5, 2015.  ECF No. 82.  On July 22, 2015, the court directed the
    parties to submit supplemental briefing on plaintiff's RLUIPA claim.  ECF No. 83.  Defendant
25  filed and served his supplemental brief on August 4, 2015.  ECF No. 84.  Plaintiff's supplemental
    brief was due within 14 days after service of defendant's brief.  ECF No. 83.  As of the date of
26  these findings and recommendations, plaintiff has not filed a supplemental brief and the time for
    doing so has expired.  However, plaintiff addressed his RLUIPA claim in his opposition to the
27  motion for summary judgment.  See ECF No. 79 at 5-6.

28

(citing <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986)).  The moving party may accomplish this by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admission, interrogatory answers, or other materials" or by showing that such materials "do not establish the absence or presence of a genuine dispute, or that the adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A), (B).

When the non-moving party bears the burden of proof at trial, "the moving party need only prove that there is an absence of evidence to support the nonmoving party's case."  <u>Oracle Corp.</u>, 627 F.3d at 387 (citing <u>Celotex</u>, 477 U.S. at 325); <u>see also</u> Fed. R. Civ. P. 56(c)(1)(B). Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  <u>See Celotex</u>, 477 U.S. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  <u>Id.</u>  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment ... is satisfied."  <u>Id.</u> at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  <u>See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  <u>See</u> Fed. R. Civ. P. 56(c)(1); <u>Matsushita</u>, 475 U.S. at 586 n.11.  Moreover, "[a] Plaintiff's verified complaint may be considered as an affidavit in opposition to summary judgment if it is based on personal knowledge and sets forth specific facts admissible in evidence."  <u>Lopez v. Smith</u>, 203 F.3d 1122,

1    1132 n.14 (9th Cir. 2000) (en banc).[2]

2           The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

3    might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby,

4    Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Assoc., 809

5    F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a

6    reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers,

7    Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

8           In the endeavor to establish the existence of a factual dispute, the opposing party need not

9    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

10   dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

11   trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

12   the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

13   Matsushita, 475 U .S. at 587 (citations omitted).

14          In evaluating the evidence to determine whether there is a genuine issue of fact," the court

15   draws "all reasonable inferences supported by the evidence in favor of the non-moving party."

16   Walls v. Central Costa County Transit Authority, 653 F.3d 963, 966 (9th Cir. 2011) (per curiam).

17   It is the opposing party's obligation to produce a factual predicate from which the inference may

18   be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244–45 (E.D. Cal. 1985),

19   aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing

20   party "must do more than simply show that there is some metaphysical doubt as to the material

21   _____

22   [2]  In addition, in considering a dispositive motion or opposition thereto in the case of a pro se
     plaintiff, the court does not require formal authentication of the exhibits attached to plaintiff's
23   verified complaint or opposition.  See Fraser v. Goodale, 342 F.3d 1032, 1036 (9th Cir. 2003)
     (evidence which could be made admissible at trial may be considered on summary judgment); see
24   also Aholelei v. Hawaii Dept. of Public Safety, 220 Fed. Appx. 670, 672 (9th Cir. 2007) (district
     court abused its discretion in not considering plaintiff's evidence at summary judgment, "which
25   consisted primarily of litigation and administrative documents involving another prison and
     letters from other prisoners" which evidence could be made admissible at trial through the other
26   inmates' testimony at trial); see Ninth Circuit Rule 36-3 (unpublished Ninth Circuit decisions
     may be cited not for precedent but to indicate how the Court of Appeals may apply existing
27   precedent).

28

                                         4

1    facts. … Where the record taken as a whole could not lead a rational trier of fact to find for the

2    nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation

3    omitted).

4         In applying these rules, district courts must "construe liberally motion papers and

5    pleadings filed by pro se inmates and … avoid applying summary judgment rules strictly."

6    Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010).  However, "[if] a party fails to properly

7    support an assertion of fact or fails to properly address another party's assertion of fact, as

8    required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion

9    . . . ." Fed. R. Civ. P. 56(e)(2).

10        III.    Undisputed Facts

11        The following summary identifies relevant undisputed facts as agreed to by the parties[3] or

12   as determined by the court based on a thorough review of the record.

13   • Prior to February 2, 2010, the dietary needs of Muslim inmates were not directly

14        addressed by CDCR regulations (Title 15, Cal. Code Regs.), the CDCR Operations

15        Manual (DOM), or any other CDCR policy or procedure.  The only CDCR inmate

16        religious diet options were the Jewish Kosher Diet, offered only to "Jewish inmates . . . as

17        determined by a Jewish Chaplin," and the Religious Vegetarian Diet, offered to inmates

         with "determined religious dietary needs." See 15 Cal. Code Regs. §§ 3054, 3054.1-

18        3054.3 (2009); DOM, Chap. 5, Art. 51, § 54080.14 (Jan. 1, 2010).  See Df. Request for

19        Judicial Notice (RFJN),[4] Ex. A, ECF No. 72-5 at 5-15.

20

21

22   [3] Pertinent facts are taken from Defendant's Separate Statement of Undisputed Facts, ECF No.
     72-3 at 1-4; Defendant's Separate Statement of Disputed Facts, ECF No. 79-1 at 1-4; Defendant's
23   Response to Defendant's Statement of Undisputed Facts, ECF No. 79-2 at 1-5); and Defendant's
     Response To Plaintiff's Additional Material Facts, ECF No. 82-2 at 1-3.  The court has
24   considered all exhibits submitted in support of each statement, including the transcript of
     plaintiff's June 4, 2014 deposition, as set forth infra.
25   [4] Defendant's requests for judicial notice are granted.  See Fed. R. Evid. 201 (a court may take
     judicial notice of facts that are capable of accurate determination by sources whose accuracy
26   cannot reasonably be questioned).  See City of Sausalito v. O'Neill, 386 F.3d 1186, 1224 n.2 (9th
     Cir. 2004) ("We may take judicial notice of a record of a state agency not subject to reasonable
27   dispute."); see also MGIC Indem. Co. v. Weisman, 803 F.2d 500, 505 (9th Cir. 1986).

28

- In January 2009, CDCR proposed regulatory changes to accommodate the dietary needs of Muslims and other inmates.  The proposal recommended that the Secretary of CDCR be authorized to prescribe regulations making the Vegetarian Diet available to any inmate for personal, ethical or religious reasons, and to create a third religious dietary option, known as the "halal meat alternate program," "open to Muslim inmates and other inmates with a religious need to consume halal meat, as determined by a Muslim Chaplain."  See Df. RFJN, Ex. B, ECF No. 72-5 at 16-20.

- On February 2, 2010, the California Office of Administrative Law approved CDCR's proposed "Religious Meat Alternate Program" (RMAP), which was set forth in a new regulation, 15 Cal. Code Regs. § 3054.3.  See Df. RFJN, Ex. C, ECF No. 72-5 at 21-2; 23-8; see also ECF No. 36 at 19.  Section 3054.3 remains the same as originally enacted, and provides in pertinent part:

> **15 Cal. Code Regs. § 3054.3: Religious Meat Alternate Program**
>
> (a) Religious meat alternates (meat that has been certified as halal) shall be available at all institutions.  Muslim inmates may participate in the program, as determined by a Muslim Chaplain or designee Chaplain.  Non-Muslim inmates with a religious dietary need may seek participation in the program by submitting to any appropriate Chaplain a CDCR Form 3030 (Rev. 08/09), Religious Diet Request, which is incorporated by reference, for determination by the Religious Review Committee (RRC).
>
> (b) All institutions will adhere to standardized departmental halal meat alternates, and approved procedures for procuring and serving halal meats.
>
> (c) Each institution shall arrange for ongoing and appropriate training for all inmate workers, custody, and food service employees involved in the supervising, ordering, and serving of halal meats.
>
> (d) The religious meat alternate program shall be administered in accordance with the provisions of this Article. A designee Chaplain shall:
>
> (1) Oversee the program and determine inmate compliance violations.
>
> (2) Review each institution's religious meat alternate program annually and provide results of the review to the Correctional Food Manager (CFM).

- The new regulations also changed CDCR's "Religious Vegetarian Diet," previously available only to "inmates with determined religious dietary needs," to a "Vegetarian Diet," available to "[i]nmates with determined religious, personal, or ethical dietary needs." Cf. Df. RFJN, Ex. A, ECF No. 72-5 at 7, with id., Ex. D, ECF No. 72-5 at 26.

- On March 18, 2010, defendant Giurbino, in his capacity as Director of CDCR's Division of Adult Institutions, issued the subject Giurbino Memorandum, entitled "Approval of Food Service Regulations, Policy, and Forms," to directed to all Division Associate Directors, Wardens and Correctional Food Managers. See FAC, ECF No. 36 at 21-3; see also ECF No. 36 at 21-3. Copies were sent to eight additional staff members, including the Senior Staff Counsel and Staff Counsel III of CDCR's Office of Legal Affairs.

**The Giurbino Memorandum provides in pertinent part:**

> The purpose of this memorandum is to announce the approval of amendments to the departmental regulations for food service and inmate religious diets, California Code of Regulations, Title 15, Sections 3054 through 3054.7, Religious Diet Program (Attachment A). These amended regulations became effective February 2, 2010.

> Effective immediately, adult institutions shall begin implementing the Religious Meat Alternate Program, the Vegetarian Diet Program, and the Jewish Kosher Diet Program as described in the amended regulations. For purposes of the Religious Meat Alternate Program, Correctional Food Managers (CFMs) shall purchase halal meats, on delegation, from [four specified food vendors]. Only halal meat processors who provide documentation that they are currently certified to all halal standards will be utilized. All adult institutions shall use the halal certified meat products and attached menus, and begin serving Religious Meat Alternate entrées as soon as possible but no later than June 28, 2010. Updated menus with approved Religious Meat Alternate entrées for the fourth quarter are attached (Attachment B).

> CFMs are advised the Religious Meat Alternate Program is a religious diet program with the vegetarian options being served for breakfast and lunch. The vegetarian option for breakfast and lunch meets halal requirements. The Religious Meat Alternate (Chicken Patty, Beef Patty, or Turkey Frank) is only offered at the dinner meal. CFMS are reminded that halal meat is to be stored on a separate dedicated shelf/pallet, prepared on a clean table and cooked separately from non halal meat. Halal meat shall be placed on a sheet pan and baked. The halal meat should be cooked prior to any other menu item to avoid cross contamination. During the serving of the meal please ensure that a dedicated utensil is used for the halal meat item to avoid any cross contamination. Dedicated storage rooms, preparation tables, or cooking trays are not necessary for halal meat. Staff shall follow normal sanitation procedures prior to and following the preparation of halal meat.

Prior to implementation, please ensure that your institutions provided mandated On-The-Job (OTJ) training concerning the amended regulations and the appropriate storage, preparation, and cooking of halal meat for the Religious Meat Alternate Program OTJ training shall be given to appropriate custody, food service staff, and inmate workers . . . .

As a result of the amended religious diet regulations, three of the following five forms (Attachment C) have been revised in August 2009 [CDCR Forms 3030 through 3030-D].

. . . If you have questions concerning the Religious Meat Alternate Program, Vegetarian Diet, or the attached documents, please contact Staff Services Analyst [] or Correctional Lieutenant [].

- In alignment with the new regulation, CDCR modified Section 54080.14 of the DOM, effective July 13, 2010, to clarify the new Religious Meat Alternate Program. See Df. RFJN, Ex. E, ECF No. 72-5 at 29-35; see also id., Ex. F, ECF No. 72-5 at 36-43 (setting forth requirements for making changes to the DOM). Section 54080.14, in pertinent part, remains the same as originally enacted, and provides:

**DOM, Art. 51, § 54080.14:  Religious Meat Alternate Program**

A Religious Meat Alternate Program (RMAP), offering meat that has been certified as halal, shall be available at all institutions. Muslim inmates may participate in the program, as determined by a Muslim Chaplain or designee Chaplain. Each institution shall endeavor to have a Muslim Chaplain employed at all times. In the absence of an employed Muslim Chaplain, the institution shall either utilize a designee Chaplain or make arrangements to utilize the services of a CDCR Muslim Chaplain from a neighboring institution.

Non-Muslim inmates with a religious dietary need may seek participation in the program by submitting to any appropriate Chaplain a CDCR Form 3030 Religious Diet Request, for determination by the Religious Review Committee RRC, as described by CCR Section 3210(d).

The RMAP is only offered at the dinner meal. Inmate participants in the RMAP shall receive the vegetarian option at breakfast and lunch. An inmate participant must show his or her religious diet card in order to receive the RMAP or vegetarian option.

All institutions will offer standardized departmental RMA items, and will adhere to approved procedures for procuring, and serving the RMA.

Each institution shall arrange for ongoing and appropriate training for all inmate workers, and custody and food service employees involved in the supervising, ordering, and serving of the RMA.

A designee Chaplain shall:

Oversee the program and determine inmate compliance violations.

Review each institution's RMAP annually and provide results of the review to the CFM.

- Plaintiff correctly emphasizes that, while the provisions of DOM Section 54080.14 are consistent with the Giurbino Memorandum (e.g., limiting Halal food service to the dinner entrée and requiring Muslim inmates to obtain the Vegetarian Diet at breakfast and lunch), these limitations are not contained in enabling regulation Section 3054.3, which broadly provides that "religious meat alternates (meat that has been certified as halal) shall be available at all institutions," 15 Cal. Code Regs. § 3054.3(a).

IV.    Plaintiff's Allegations

The court recounts plaintiff's allegations in detail to clarify plaintiff's competing concerns and his alternate requests for relief.  This account also demonstrates defendant's selective construction of plaintiff's claims.

A.  Plaintiff's Original Complaint and Motion for Preliminary Injunctive Relief

While incarcerated at High Desert State Prison (HDSP), plaintiff commenced this action by filing his original complaint on September 21, 2011.  ECF Nos. 1, 1-1.  Plaintiff alleged that he was a practicing Muslim and had been requesting "a Halal and or Kosher diet since October 2, 2008."  ECF No. 1-1 at 1.  Plaintiff alleged that defendant Giurbino and others were "(1) denying plaintiff [] an adequate Halal diet while allowing Jewish inmates full kosher meals at breakfast, lunch and dinner; (2) prohibiting [plaintiff] from a kosher diet made lawful to him in The Holy Qur'an; [and] (3) forcing him to be a vegetarian by lawfully substituting haram (unlawful) meat with peanut butter or beans. . . ."  ECF No. 1 at 3.

Plaintiff averred that while his pertinent administrative grievance, Appeal Log No. HDSP-B-10-1140, was pending first formal level review, "CDCR proposed a policy change on or about January 16, 2009, that allowed an religious meat alternative entrée at dinner only. . . ."  Id. However, alleged plaintiff, id.:

This diet is not adequate because the meat entrée may be halal but

9

the rest of the food is haram (unlawful).  What's more, Mr. Giurbino sent a memo only to Correctional Food Managers (hereafter C.F.M.) authorizing them to substitute haram (unlawful) meat with a vegetarian option i.e. peanut butter or beans.  Said memo was not included in the Notice of Change of Regulation, not in the Department Operation Manual (D.O.M.) or California Code of Regulations Title 15 and was not heard by the public or a court[.]

Plaintiff alleged that receiving the Halal meat entrée at dinner only provides neither a Halal meal nor a Halal diet.  Id.  Plaintiff sought injunctive relief, including "ordering CDCR to provide him (1) full halal meals, i.e., entrée, vegetables, fruits, snacks etc. as halal requires and Jewish inmates receive; (2) accommodate [plaintiff] with a kosher diet until CDCR can provide him with a Halal diet; [and] (3) prevent CDCR from unlawfully substituting or changing religious diet without following lawful protocols. . . ."  ECF No. 1 at 3; ECF No. 1-1 at 2.

Plaintiff's original complaint noted his attempt to obtain injunctive relief in the state courts.  See ECF No. 1-1 at 1; see also ECF No. 19 at 3-4, 10; ECF No. 36 at 12-3.  In a petition for writ of habeas corpus filed November 10, 2009, in the Lassen County Superior Court, plaintiff sought an order directing CDCR to provide him with Kosher meals.  In response to the petition, respondent argued that plaintiff's claims should be denied as imminently moot because CDCR would be providing Halal meals by summer 2010.  Respondent noted that "[a]lthough Robinson is seeking kosher meals as a temporary solution to not having halal meals, his ultimate goal is to obtain the latter," and "Kosher meals are reserved only for Jewish inmates under the regulations."  On June 4, 2010, plaintiff's petition was denied based on the court's finding "that Petitioner's right to freely exercise his religion and equal protection has not been impinged, as a vegetarian meal has been offered to him, which is in accordance with the Muslim diet."[5]  See ECF No. 1-1 at

---

[5]  The Lassen County Superior Court, in In Re: Andre Robinson, Case No. CHW2730, further reasoned, see ECF No. 36 at 13:

It is also noted that C.C.R. Section 3054.2 limits kosher meals to Jewish inmates due to the cost and burden it would place on the system in providing kosher meals to all individuals who request them.  Substantial deference is afforded prison administrators, who bear the responsibility of defining the legitimate goals of the correctional system and the appropriate means of accomplishing them (O'Lone v. Estate of Shabazz (1987) 482 U.S. 342, 349).  It would therefore appear that a legitimate penological goal has been

(continued…)

1; ECF No. 19 at 3, 4 and 10 (portion of respondent's brief); ECF No. 36 at 6, 12-3; and Docket,

Lassen County Superior Court, <u>In Re: Andre Robinson</u>, Case No. CHW2730.[6]

Also in his original complaint, plaintiff referenced the success of another Muslim inmate

who, in December 2008, obtained a state court order directing that he receive Kosher meals

pending implementation of CDCR's Halal meal program.[7]

Defendant moved to dismiss plaintiff's original complaint. In response, plaintiff filed a

motion for preliminary injunctive relief, pursuant to which he sought: (1) all Kosher meals until

---

stated. The State has also satisfied the rational basis standard in denying the Kosher meal to Petitioner, even if an impediment to Petitioner's rights were found, which they were not (see <u>Turner v. Safley</u> (1987) 482 U.S. 78, 89-91). For the above stated reasons, the Petition for Writ of Habeas Corpus is denied and the Order to Show cause is discharged.

[6] This court may take judicial notice of its own records and the records of other courts. <u>See United States v. Howard</u>, 381 F.3d 873, 876 n.1 (9th Cir. 2004); <u>United States v. Wilson</u>, 631 F.2d 118, 119 (9th Cir. 1980); <u>see also</u> Fed. R. Evid. 201 (court may take judicial notice of facts that are capable of accurate determination by sources whose accuracy cannot reasonably be questioned).

[7] Petitioner submitted the December 12, 2008 order of Marin County Superior Court Judge Lynn O'Malley Taylor, in <u>In Re: Keith Allen Lewis</u>, Case No. SC158441A, which provides in pertinent part, <u>see</u> ECF No. 19 at 22-23; <u>see also</u> ECF No. 36 at 26:

> Petitioner Lewis, a Muslim prisoner, has requested that CDCR provide Halal meals to him and to all Muslim prisoners. Respondent CDCR is moving through the Administrative Procedures Act to provide Halal meals as early as July, 2009. Thus, the issue as to whether or not CDCR should be required to provide Halal meals appears to be moot. CDCR is proceeding to do exactly what petitioner Lewis has requested. Therefore, the petition for Habeas Corpus so far as it requests that the court order CDCR to provide Halal meals to all Muslim prisoners including Mr. Lewis is denied.

> However, until such time as CDCR provides Halal meals to all Muslim prisoners, petitioner [] shall have the option of selecting a Kosher meal in lieu of the normal or vegetarian meals provided. Muslim inmates in other CDCR institutions are permitted access to Jewish Kosher meals as an alternative to Halal meals providing that they obtain their religious meal card in accordance with CDC Operations Manual Section (DOM) 54080.14. Based on the evidence present, the court finds that the impact on the security, safety and day to day operations of San Quentin in providing petitioner Lewis with a Kosher meal until the Halal meals are provided to all Muslim prisoners to be de minimus.

1   CDCR provides him with all Halal meals; (2) a Kosher/Halal meal at breakfast, lunch and dinner;

2   (3) the separate processing, preparing and serving of Kosher/Halal foods to prevent contamination

3   with Haram (unlawful) foods; and (4) Kosher/Halal meals served covered to protect from cross-

4   contamination.  See ECF No. 19.  The court denied the motion, and dismissed plaintiff's original

5   complaint with leave to file an amended complaint.  See ECF Nos. 31, 35.

6          B.  Plaintiff's Operative First Amended Complaint

7          In the operative First Amended Complaint (FAC), plaintiff alleges that he, a practicing

8   Muslim, began in 2008 to request that he be provided a Kosher diet because CDCR did not offer a

9   Halal diet.  FAC, ECF No. 36 at 1.  Plaintiff's requests were denied.  On July 18, 2010, while

10  incarcerated at HDSP, plaintiff challenged the matter in an administrative grievance, Appeal Log

11  No. HDSP-B-10-01140.  Although neither party has submitted a copy of plaintiff's original

12  grievance, its content may be inferred by the resultant administrative decisions.[8]

13         The Informal Decision, issued July 21, 2010, by Correctional Supervising Cook L. Del

14  Carlo, relied on the Giurbino Memorandum to deny plaintiff's request to "[i]mplement Halal

15  meat alternatives for breakfast, lunch and dinner," but granted plaintiff's request to receive

16  "peanut butter or any other vegetarian alternate" with his vegetarian meals at breakfast and/or

17  lunch.  ECF No. 79-1 at 22.

18         The First Level Decision partially granted plaintiff's grievance on the ground that plaintiff

19  had been permitted to interview with a Correctional Food Manager, and was able to continue

20  receiving Halal meat at dinner; however, plaintiff was informed that HDSP could "not serve you

21  complete Halal meals three times daily per CDCR regulations as set forth by the Director, Mr.

22  Giurbino."  Id. at 21.

23         The Second Level Decision again informed plaintiff that "HDSP is complying with the

24  direction of our Director, Division of Adult Institutions (see attached memorandum) per his

25  memorandum dated March 18, 2010," and on this basis partially granted the grievance.  Id. at 17.

26

27  ――――――――――――――
    [8]  Copies of these administrative decisions are included as exhibits to the FAC, ECF No. 36 at 9-
28  10, and plaintiff's opposition to the motion for summary judgment, ECF No. 79 at 21-5.

1        The Director's Level Decision (DLD) issued on February 28, 2011.  FAC, Ex. A, ECF

2    No. 36 at 9-10.  The DLD noted plaintiff's complaints that he received Halal meat only at dinner

3    and not on Fridays; that he was required to take the Vegetarian Diet trays at breakfast and lunch;

4    and that HDSP kitchen staff refused to provide plaintiff with peanut butter as a protein alternative

5    at lunch.  The DLD noted plaintiff's request that he be provided Halal meat at every meal.

6        The DLD denied plaintiff's grievance on the ground that his diet was in compliance with

7    departmental policy, as set forth in the California Code of Regulations, Title 15, Section 3054; the

8    Department Operations Manual (DOM), Section 54080.14; and the March 18, 2010 Giurbino

9    Memorandum.  In response to plaintiff's complaints of discrimination, the DLD ruled, ECF No.

10    36 at 9-10:

> The actions of allowing Jewish inmates to receive a kosher meal at breakfast and the Muslim[] inmate[s] to have a vegetarian meal are not a discriminator[y] practice.  Both meals meet the religious requirements for the practicing inmate population.  Therefore, both religious groups are afforded a religious meal consistent with their beliefs. . . . [Plaintiff] continues his arguments that Jewish inmates are provided their kosher meals at all feedings and the Halal meat is only during the dinner meal.  The appellant has not been able to provide any support for his argument that he is being discriminated against.  He is served his meal in accordance with Department policy.  He has not been able to demonstrate otherwise that he is not receiving his correct meal pursuant to the C.C.R. 3054.3.

18        While housed at HDSP, plaintiff maintained a "Halal" Religious Diet Card.  See FAC, Ex.

19    C, ECF No. 36 at 15.  He alleges, "however, the diet implemented was a Religious Meat

20    Alternative that provides a Halal meat entrée at dinner only and may be substituted at the

21    discretion of Food Management Staff with an vegetarian option."  FAC, ECF No. 36 at 2.

22        Plaintiff was transferred to the California Substance Abuse Treatment Facility (CSATF) in

23    October 2011.  He alleges that there he "requested a Kosher diet twice and a R.M.A. [diet] once

24    via C.D.C. [Form] 3030 [Religious Diet Request] and all request[s] went unanswered."  FAC,

25    ECF No. 36 at 2.

26        In April 2013, plaintiff was transferred to SCC.  Plaintiff states in his opposition to the

27    pending motion for summary judgment that, "[i]n April 2014, Defendant Giurbino's directive was

28    again used to deny Plaintiff halal meals while residing at Sierra Conservation Center."  ECF No.

79 at 2; see also id. at 23-8, Pl. Ex. D (Apr. 16, 2014 Second Level Decision in Appeal Log No. SCC-X-14-00336, with attached Giurbino Memorandum, denying plaintiff's requests that Halal meat be served at breakfast and lunch as well as dinner; that there be no Halal meat substitutes; and that fish be Halal).

At the core of plaintiff's FAC is his claim that existing CDCR regulations and policies fail to accord Muslim inmates with the same dietary deference accorded Jewish inmates.  Plaintiff alleges that "nutrition is not the issue, being Halal (lawful) is the issue."  FAC, ECF No. 36 at 4. Plaintiff explains, id. at 4-5:

> Every aspect of a Kosher diet is Kosher down to the condiments. . . .  Inmates participating in the Kosher diet program receive Kosher meals, i.e. entrée, vegetables, rice, pasta, fruit, snacks, condiments, etc. at breakfast, lunch and dinner.  Kosher meals come in a individually sealed tray and on a separate food cart to protect it from cross-contamination with Haram/unlawful foods.  All Kosher foods are certified Kosher and certified Halal and procured from the appropriate vendor possessing valid certification.  There is no provision that allow anyone to alter this diet for any reason.

In contrast, plaintiff alleges, Muslim inmates are offered only a Halal entrée with the dinner meal, and non-Halal vegetarian meals at breakfast and lunch.  As alleged in the FAC, id. at 4-5:

> The food served with the Halal meat of the RMA is not Halal in that it is not purchased from a certified Halal vendor as the meat prescribed in Mr. Giurbino's memorandum, does not have Halal documentation and thus cross-contaminates the Halal meat entrée served at dinner. . . . The key word in this is "meal" not "entrée" . . . . Further, at breakfast and lunch, the RMAP is "forcing Mr. Robinson to be vegetarian which he is not."

The FAC alleges that defendant Giurbino is civilly liable based on his "memorandum to Associate Directors-Division of Adult Institutions, Wardens, [and] Correctional Food Managers that contains provisions on how the Halal meat is to be cooked, stored and purchased."  FAC at 3. Plaintiff asserts that defendant "Mr. Giurbino's memorandum is a CDCR state-wide policy. Anywhere Mr. Robinson is subject to [be] transferred to, he will encounter the same religious impediments."  FAC at 6.  Plaintiff asserts that defendant Giurbino improperly added language in his memorandum that was later reflected in the DOM, but is not authorized by enabling regulation 15 Cal. Code Regs. § 3054.3, see FAC at 3-4:

> [A]dded was the language, 'C.M.F.'s are advised the Religious

14

1
2
3
4
5

> Meat Alternate Program is a religious diet program with the vegetarian option being served for breakfast and lunch.'  This language isn't in the California Code of Regulations Title 15 Sections 3054 through 3054.7 and not contained in the C.C.R. Title 15 whatsoever.  Mr. Giurbino is not a[n] Imam, Chaplain, Muslim or an expert on Islamic precepts and his own authority altered a religious diet.  This memorandum authorizes CDC personnel to alter a religious diet thus forcing Mr. Robinson to be a vegetarian. CDC does not have any other such provision on any other faiths.

6   Pursuant to the FAC, plaintiff seeks a fully Halal diet or, alternatively, a fully Kosher diet,

7   and compensatory and punitive damages.  FAC at 6-7.

8   C.  Plaintiff's Deposition Testimony

9   Plaintiff testified as follows at his June 4, 2015 deposition.  See ECF No. 71 (Lodged

10   Transcript of Pl. Depo.).  Plaintiff was initially incarcerated under the authority of CDCR in 2006,

11   at R.J. Donovan Correctional Facility.  Plaintiff was transferred to HDSP in December 2007,

12   where he remained until August 2011, when he was transferred to CSATF.  Plaintiff was

13   transferred to SCC in April 2013.  Pl. Depo. at 9:21-10:25.

14   Plaintiff converted to Islam in September 2007 and his sincerely held religious beliefs

15   dictate that he follow a Halal diet.[9]  Id. at 12:11-2.  A proper Halal diet includes raw or natural

16   food and meat that has been slaughtered according to religious principles.  Id. at 20:10 – 21:20.

17   At a minimum, the meat must be certified Halal, and the vegetables need to be Halal or at least

18   organic.  Id. at 26:18-25; 27:12-6; 55:9-16.  The packaging of properly certified Halal food bears

19   the letter "M" and the symbol of a crescent moon.  Id. at 22:6-18.  Food bearing a crescent moon

20   and the letter "H" may not be Halal.  Id. at 22:19- 23:8.  Plaintiff has "been eating the Halal with

21   the H because that's what they give us."  Id. at 43:11-2.  The only way Muslims can be certain

22   that a particular food is Halal is by reviewing a list of the ingredients and seeing that it is certified

23   with the letter "M" and a crescent moon.  Id. at 23:14-9; 24:2, 19-21; 26:11-6; 27:3-5; 27:20-28:4;

24   33:3-25; 35:8-36:7; 37:2-38:10; 39:3-7; 43:6-8; 44:19-22.  Plaintiff conceded that it is unlikely

25

26   [9]  Plaintiff's resources for assessing whether his diet conforms to Islamic principles include the prison chaplain, and the books entitled Islamic Dietary Precepts and Practice; Comprehensive List

27   of Halal Food Products United States and Canada; Halal and Haram; and How to Eat to Live.  Pl. Depo. at 16:17- 20:9; 28:23-5; 53:17-24.

28

CDCR will provide an opportunity for such scrutiny.  Id. at 23:20-3.  However, when plaintiff was "back east," he received Halal food on a sealed tray, with an M or H for Halal, or J or K for Kosher, and a list of the ingredients for his review.  Id. at 34:1-47.

The only Halal food provided by CDCR is the entrée at the dinner meal -- usually a beef patty, chicken patty or two turkey franks, but sometimes fish, egg rolls or pizza.  The Halal entrée is placed on the same meal tray as Haram (non-Halal) food items, thus contaminating the Halal food.  Id. at 25:22-26:3; 32:5-25; 34:9, 13-24; 36:8-10; 39:22-40:4; 58:6.  The fish is not necessarily Halal.  When offered fish, plaintiff declines it, asks for another potato, or takes the regular tray instead.  Id. at 68:24-70:12.  Plaintiff also declines the fish as a personal choice because it previously made him ill.  Id. at 70:14-71:15; 75:8-12.  As a RMAP participant, plaintiff is provided the Vegetarian Diet at lunch and breakfast, which includes the option of obtaining Halal-certified peanut butter and/or cheese for additional protein.  Id. at 34:25- 35:7.

Plaintiff maintains that the RMAP does not provide a Halal diet.  Id. at 59:10-60:13.  He submitted a more recent administrative grievance clearly seeking a fully Halal diet, "for the whole food, all of the food, not just the meat. . . ."  Id. at 39:13-21; see Pl. Oppo. to MSJ, Ex. D, ECF No. 79-1 at 24-5.  Plaintiff seeks "a sealed tray that had the ingredients on it and the markings that it is certified Halal. . . . You see the ingredient[s].  You see that it's certified Halal, and it's sealed to protect it from cross-contamination. . . . with the crescent and the M."  Id. at 40:8-15, 20.  However, it may be acceptable to receive a fully-sealed Halal meal tray without the crescent and M certification, provided plaintiff receives a list of ingredients for review.  Id. at 40:24-43:5.

Plaintiff is not seeking, by this action, to receive Halal meat when other inmates are not receiving meat; it is acceptable to plaintiff that he receive meat at the same frequency as other inmates.  Hence, if the regular meal provides meat, then plaintiff believes he is entitled to be served Halal meat at that meal.  Id. at 46:11-49:25; 50:4-10.  However, plaintiff is not a vegetarian and eating the Vegetarian Diet at breakfast and lunch causes him physical distress, particularly constipation, as a result of eating cheese, soy and peanut butter as protein alternatives.  Id. at 85:11-91:18.

It is religiously permissible for plaintiff to eat an Orthodox Kosher diet as an alternative to

16

a fully Halal diet.  Id. at 56:23-4.  If a fully Halal diet is not available, then eating Kosher would be the option most aligned with plaintiff's religious beliefs.  Id. at 56:7-11.  Plaintiff explained that "Kosher is similar, close[r] than any other diet as far as what Islam practices."  Id. at 59:1-3; see also 24:22-25; 58:14-21 (eating available food is permissible if plaintiff is not being willfully disobedient).  Moreover, CDCR fully meets the religious dietary requirements of its Jewish inmates, by providing entire Kosher meals sealed in plastic to prevent cross contamination.  Id. at 24:4-7; 39:18-21.  Plaintiff described the differences between the RMAP and JKDP as follows, id. at 83:1-84:22; see also 84:23-85:10:

> Everything that they consumer is Kosher.  The foods, the vegetables, the entrée, the meat, drink, condiments, and they get it a[t] breakfast, lunch and dinner [on a sealed tray certified by an outside vendor]. . . .  We only get [RMAP] at dinnertime, and it is placed on the tray with Haram foods. . . .  The meal is not Halal.  I don't even know if the meat patties are Halal. . . .

Plaintiff requested a Kosher diet in October 2008 because a Halal diet was not available and the RMAP had not yet been implemented.  Id. at 57:17- 58:6; 58:24-59:7; 60:14-8.  Plaintiff's request for a Kosher diet was denied because plaintiff is not Jewish and it was anticipated that he would soon be receiving Halal meals.  Id. at 59:10-1.  In 2008 or 2009, while at HDSP, plaintiff received a diet card designated Halal, prior to the implementation of the RMAP.  Id. at 60:18-61 - 63:22; see also FAC, Pl. Ex. C-A, ECF No. 36 at 15.  Plaintiff later participated directly in the RMAP.  Id. at 60:22-63:22.  He continued to use the HDSP-issued diet card issued at CSATF and SCC, with the addition of a red sticker designating his participation in the RMAP.  Id. at 65:21-68:23; 79:18-23.

However, at the time of his deposition on June 4, 2014, plaintiff testified that he was not then in the RMAP and had been taking the regular meal tray at SCC for the last month and a half.  Id. at 34:10-1; 71:16-20; 73:20-4.  This was due to an erroneous administrative determination, in response to a new grievance filed by plaintiff, that plaintiff had never been in the RMAP.  Id. at 76:5-25; 77:16.  Plaintiff testified that he had completed the necessary paperwork (CDC Form 3030) when he arrived at SCC to obtain the appropriate red sticker on his diet card, and that his name is on the SCC "Halal Religious Meal List" for Facility D.  Id. 77:16-78:7; 79:18-24; see

17

1    also FAC, Pl. Ex. D-A, ECF No. 36 at 17.  At the time of his deposition, plaintiff had not

2    requested that he be re-admitted to the RMAP because "[s]omebody [else] dropped the ball" and,

3    in any case, the RMAP "is not Halal.  So and in that case, it doesn't really matter what they give

4    me if it's all Haram now."  Id. at 77:5-14, 78:6.

5            Plaintiff is suing defendant Giurbino because he authored the subject March 18, 2010

6    Memorandum which established the directive policy for the RMAP.  Plaintiff has never met

7    defendant.  Id. at 79:25-81:21.  Plaintiff challenges the Giurbino Memorandum and RMAP on the

8    following grounds: (1) the RMAP does not provide a Halal diet, only an Halal entrée with each

9    evening meal; (2) the RMAP authorizes correctional food managers to substitute the vegetarian

10   option for breakfast and lunch, id. at 81:22-82:25; and (3) the RMAP diet is not on "parity" with

11   the Jewish Kosher Diet Program (JKDP).  Plaintiff contends that neither of the first two grounds

12   are authorized by the regulation establishing the RMAP, only by the Giurbino Memorandum and

13   the resulting DOM provision.

14           Pursuant to this lawsuit, plaintiff has "wanted from the beginning [to have CDCR]

15   observe my religious diet to the fullest."  Id. at 91:22-5.  The injunctive relief plaintiff seeks is to

16   be served a complete Halal meal at breakfast, lunch and dinner, on a sealed tray that identifies all

17   ingredients and is Halal certified with the "M" and crescent moon.  Id. at 93:11-22.  Alternatively,

18   plaintiff seeks full participation in the JKSP, or the means to purchase his own food.  Id. at 92:4-

19   6.  Although SCC would permit plaintiff to purchase and consume food from an outside Halal

20   vendor, plaintiff doesn't have the money to do so.  Id. at 93:8-10.  Plaintiff seeks damages in the

21   amount of one million dollars for "purchasing my own food for the rest of my life in CDC."  Id.

22   at 92:10-6; 92:25-93:10.  Plaintiff also seeks declaratory relief pursuant to a finding that the

23   RMAP is inadequate, and his costs in bringing this action.  Id. at 93:23-94:16.

24   V.      Analysis

25           A.  Preliminary Considerations

26           Defendant seeks dismissal of plaintiff's damages claims on the merits or, alternatively, on

27   qualified immunity grounds, and asserts that plaintiff's claims for declaratory and injunctive relief

28   ////

1   are moot and directed against the wrong official.[10]  Before turning to the substance of the claims,

2   the court considers defendant's preliminary arguments.

3                           1.  Availability Of Injunctive Relief

4          Under RLUIPA, plaintiff may proceed against defendant only in his official capacity for

5   prospective injunctive relief.  See Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. June 26,

6   2015) (citing Sossamon v. Texas, 131 S. Ct. 1651, 1658-59 (2011); Wood v. Yordy, 753 F.3d

7   899, 903-04 (9th Cir. 2014); and Oklevueha Native Am. Church of Haw. v. Holder, 676 F.3d 829,

8   840-41 (9th Cir. 2012)).  Money damages are not available under RLUIPA against state officials

9   sued in their official capacities, Alvarez v. Hill, 667 F.3d 1061, 1063 (9th Cir. 2012), or in their

10  individual capacities, Wood, 753 F.3d at 901.  However, plaintiff may obtain declaratory relief on

11  his RLUIPA and Section 1983 claims.  See Mayweathers v. Swarthout, 2011 WL 2746067 at *10,

12  2011 U.S. Dist. LEXIS 76413 at *32 (E.D. Cal. July 14, 2011) (findings and recommendations,

13  adopted by order filed Aug. 26, 2011) (collecting cases).

14         Under Section 1983, plaintiff may also seek prospective injunctive relief against

15  defendant in his official capacity.  See Thornton v. Brown, 757 F.3d 834, 839 (9th Cir. 2013)

16  (citing cases).  "Official-capacity suits . . .  generally represent only another way of pleading an

17  action against an entity of which an officer is an agent.  As long as the government entity receives

18  notice and an opportunity to respond, an official-capacity suit is, in all respects other than name,

19  to be treated as a suit against the entity."  Kentucky v. Graham, 473 U.S. 159, 165-66 (1985)

20  (citing, inter alia, Monell v. Dept. of Soc. Servs. of N.Y.C., 436 U.S. 658, 690 n.55 (1978)).

21         In an official-capacity action, a governmental entity may be liable under Section 1983 if it

22  was the "moving force" behind the alleged violation of constitutional rights, based on the entity's

23  "policy or custom."  Graham, 473 U.S. at 166-67 (citations and internal quotation marks omitted).

24  As the Ninth Circuit Court of Appeals explained in Hartmann v. California Dept. of Corrections

25  and Rehabilitation, 707 F.3d 1114, 1127 (9th Cir. 2013):

26  _____

[10]  Although unspecified in plaintiff's original complaint or the FAC, plaintiff appears to sue

27  defendant Giurbino in both his individual and official capacities.  The court thus broadly
    construes the FAC.

28

1
2
3
4
5

> A plaintiff seeking injunctive relief against the State is not required to allege a named official's personal involvement in the acts or omissions constituting the alleged constitutional violation. See id.; Graham, 473 U.S. at 166. Rather, a plaintiff need only identify the law or policy challenged as a constitutional violation and name the official within the entity who can appropriately respond to injunctive relief. See L.A. Cnty. v. Humphries, 562 U.S. 29, 131 S. Ct. 447, 452, 454 (2010); Hafer [v. Melo], 502 U.S. [21] at 25 [1991].

6   Defendant contends that plaintiff's claims for injunctive relief are moot because plaintiff

7   was transferred from HDSP, where his claims arose. See ECF No. 82 at 8. This contention is

8   without merit. A case is moot only "when it has lost its character as a present, live controversy of

9   the kind that must exist if the court is to avoid advisory opinions on abstract propositions of law."

10   Walker v. Beard, 789 F.3d 1125, 1132 (9th Cir. June 18, 2015) (citations, internal quotation

11   marks and punctuation omitted). It is clear that plaintiff is challenging the RMAP as an ongoing

12   state-wide policy applied to plaintiff at each of the institutions in which he has been incarcerated,

13   and the Giurbino Memorandum as the "moving force" behind the policy. As this court previously

14   found in dismissing plaintiff's original complaint with leave to amend, plaintiff's transfer did not

15   moot his claims against defendant in his official capacity because plaintiff appeared to "be

16   alleging that a CDCR policy prevents him from receiving a 'full Halal meal.'" See ECF No. 31 at

17   9:20-6.

18   Accordingly, defendant is not entitled to summary judgment on plaintiff's requests for

19   injunctive relief on the ground that such relief is moot.

20   Defendant also contends that, despite remaining a CDCR official and administrator, he is

21   without authority to "change policy as it relates to the Religious Meat Alternate Program" or

22   control the food service within particular institutions. Giurbino Decl., ECF No. 84-2 at 2.

23   Defendant has filed a declaration in which he states that he retired from CDCR effective

24   December 31, 2011, following a two-year term as Director of CDCR's Division of Adult

25   Institutions. From January 1, 2012 to the present, defendant has been employed as a retired state

26   annuitant in the capacity of Chief Deputy Administrator, Division of Adult Institutions.

27   Defendant describes his current responsibilities as follows, Giurbino Decl., ECF No. 84-2 at 1-2:

28

> My current job duties are focused entirely on the implementation of the Instructional Memorandum regarding the Security Threat Group pilot program and revised STG Regulations. In my current capacity within CDCR, I do not have the authority to change policy as it relates to the Religious Meat Alternate Program, nor do I have any control over the foods served within particular institution.

When a prisoner is seeking injunctive or declaratory relief against prison officials, the court's inquiry into causation is "broader and more generalized" than when considering the more refined causal connection required in an individual damages claim. See Leer v. Murphy, 844 F.2d 628, 633-34 (9th Cir.1988) (citation omitted); accord, Peralta v. Dillard, 744 F.3d 1076, 1083-84 (9th Cir. 2014). In considering the appropriateness of granting injunctive relief, the court must "focus on whether the *combined* acts or omissions of the state officials responsible for operating the state's penal system created living conditions" that violate the Constitution. Leer, 844 F.2d at 633 (emphasis added).

The court finds it significant that defendant retains an administrative position in the same office – Division of Adult Institutions – from which he issued his challenged Memorandum. While defendant's direct responsibilities have changed, he remains a senior administrator overseeing the operations of CDCR's adult correctional institutions. It is unreasonable to assume that defendant is now precluded from effecting statewide CDCR policy and/or implementing injunctive relief ordered by the court. As the author of the subject Memorandum in his capacity as Director of the Division of Adult Institutions, and as a continuing administrator within the Division of Adult Institutions, defendant Giurbino remains the most appropriate prison official named, and remaining, as a defendant in this action.

Moreover, should defendant prove to be without authority to implement any injunctive relief that may be entered in this case, the court is authorized to substitute as a defendant herein Mr. Giurbino's successor Director of CDCR's Division of Adult Institutions,[11] or other appropriate official. As set forth in Rule 25, Federal Rules of Civil Procedure:

---

[11] Defendant does not allege that he, while Director of CDCR's Division of Adult Institutions, was without authority to implement plaintiff's requested injunctive relief, or that any successor Director of CDCR's Division of Adult Institutions is without such authority.

> An action does not abate when a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to hold office while the action is pending. The officer's successor is automatically substituted as a party. . . . The court may order substitution at any time, but the absence of such an order does not affect the substitution.

Fed. R. Civ. P. 25(d); see Hoptowit v. Spellman, 753 F.2d 779, 781-82 (9th Cir. 1985) (authorizing continuation of a class action suit for injunctive relief against defendant official's successor).  This option may be particularly applicable here, where it is clear that defendant's successor(s) continue to administer the RMAP as originally set forth in the Giurbino Memorandum.[12]

Finally, the court is cognizant that in cases brought by prisoners involving conditions of confinement, any grant of prospective injunctive relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs. . . , is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right.  The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1).  See Oluwa v. Gomez, 133 F.3d 1237, 1239 (9th Cir. 1998).  "In general, injunctive relief is to be used sparingly, and only in a clear and plain case. . . only when irreparable injury is threatened, and [without] unnecessary disruption to the state agency's normal course of proceeding."  Gomez v. Vernon, 255 F.3d 1118, 1128 (9th Cir. 2001).

For these several reasons, the court finds that defendant is not entitled to summary judgment on plaintiff's requests for declaratory and prospective injunctive relief against

---

[12]  Cf., Spomer v. Littleton, 414 U.S. 514, 521 (1974) (remanded for determination whether the alleged constitutional violations were "personal" to the departed official or whether his successor followed the challenged practices); Mayor of the City of Philadelphia v. Educ. Equal. League, 415 U.S. 605, 622 (1974) ("Where there have been prior patterns of discrimination by the occupant of a state executive office but an intervening change in administration, the issuance of prospective coercive relief against the successor to the office must rest . . . on supplemental findings of fact indicating that the new officer will continue the practices of his predecessor." (Citing Spomer, 414 U.S. 514)).

22

1  defendant in his official capacity.

2          2. <u>Plaintiff's Damages Claims</u>

3       Defendant correctly contends that, in his official capacity, he is immune from plaintiff's

4  damages claims. <u>See</u> <u>Peralta v. Dillard</u>, 744 F.3d 1076, 1083-84 (9th Cir. 2014) (official capacity

5  suits under Section 1983 are immune from damages under the Eleventh Amendment's grant of

6  sovereign immunity) (citing <u>Quern v. Jordan</u>, 440 U.S. 332, 345 (1979)); <u>Jones</u>, <u>supra</u>, 791 F.3d

7  at 1031 (RLUIPA claims are appropriate only as official capacity suits for declaratory and

8  prospective injunctive relief).

9       Defendant further contends that the FAC and record fail to demonstrate his personal

10  involvement in the alleged violation of plaintiff's rights sufficient to render him liable for

11  damages in his individual capacity. The FAC alleges that defendant Giurbino, "by his own

12  authority" and as articulated in his March 10, 2010 Memorandum, established unconstitutional

13  statewide policies governing the implementation and operation of the RMAP by defendant and

14  his subordinates. This court previously denied defendant's motion to dismiss based on the

15  contention that the FAC fails to sufficiently allege defendant Giurbino's personal involvement in

16  implementing the RMAP. The court found:

17            Attached to the first amended complaint is a copy of the March 18,
18            2010 Giurbino Memorandum which forms the putative basis of
          defendant Giurbino's liability. ECF No. 36 at 21-23. This
19            memorandum is relied upon in the Director's Level Appeal
          Decision of plaintiff's 602 grievance concerning the
20            implementation of the Religious Meat Alternative Program by High
          Desert State Prison. ECF No. 36 at 9-10. While defendants allege
21            otherwise, the memorandum specifically states that the vegetarian
          meal option is to be served for breakfast and lunch with the
22            Religious Meat Alternate to be offered only at the dinner meal. <u>See</u>
          ECF No. 36 at 21-23. This policy lies at the heart of plaintiff's
23            complaint regarding the Religious Meat Alternative Program, and
          Giurbino is the policy's author.

24       Review of the record developed on summary judgment supports the court's initial

25  assessment. The revised regulation, effective February 2, 2010, broadly directs that "[r]eligious

26  meat alternates (meat that has been certified as halal) shall be available at all institutions," and the

27  RMAP "shall be administered in accordance with the provisions of this Article." 15 Cal. Code

28  Regs. § 3054.3. Defendant's Memorandum, issued March 18, 2010, narrowly construes and

1    implements the revised regulation to limit the RMAP to Halal dinner entrées with the Vegetarian

2    Diet for breakfast and lunch.  The DOM provision, effective July 13, 2010, mirrored the language

3    of the Giurbino Memorandum, directing that "[t]he RMAP is only offered at the dinner meal,"

4    and "participants in the RMAP shall receive the vegetarian option at breakfast and lunch."  See

5    DOM, Art. 51, § 54080.14; see also RFJN, Ex. F, ECF No. 72-5 at 43 (July 13, 2010 Notice of

6    Change to DOM, Chap. 5, Art. 51, Food Service).

7           Defendant maintains that is was "the DOM, and not Defendant's memo, which set into

8    motion the manner in which the RMAP is implemented. . . . Defendant's memo did not set

9    establish (sic) policy; it simply announced a policy already put in place."  ECF No. 72-2 at 11.

10   However, the above-noted chronology of these matters demonstrates that defendant's

11   Memorandum was issued between the effective dates of the pertinent regulation and the DOM

12   provision.  Defendant has submitted excerpts from the DOM describing the promulgation, review,

13   approval and dissemination process for new DOM provisions.  See RFJN, Ex. F, ECF No. 72-5 at

14   36-43.  However, defendant has submitted no copy of the subject DOM provision in draft form,

15   which would support defendants' assertion that his Memorandum only "announced a policy

16   already put in place."  Indeed, defendant has submitted no evidence contradicting plaintiff's

17   allegation that the Giurbino Memorandum, which was "effective immediately" and intended to be

18   specifically relied upon by all of CDCR's institutional Correctional Food Managers, itself

19   established the statewide policy that was later reflected in the DOM.

20          "Personal-capacity suits seek to impose personal liability upon a government official for

21   actions he takes under color of state law. . . . [T]o establish personal liability in a § 1983 action, it

22   is enough to show that the official, acting under color of state law, caused the deprivation of a

23   federal right."  Graham, 473 U.S. at 165-66 (citations omitted); see also Rizzo v. Goode, 423 U.S.

24   362, 371 (1976); Johnson v. Duffy, 588 F.2d 740, 743 (9th Cir. 1978); May v. Enomoto, 633 F.2d

25   164, 167 (9th Cir. 1980).  A supervisor "can be held liable in his individual capacity . . .  [if] he

26   set in motion a series of acts by others, or knowingly refused to terminate a series of acts by

27   others, which he knew or reasonably should have known, would cause others to inflict the

28   constitutional injury."  Blankenhorn v. City of Orange, 485 F.3d 463, 485 (9th Cir. 2007)

1    (citations, punctuation and internal quotation marks omitted); see also Preschooler II v. Clark

2    County School Board, 479 F.3d 1175, 1182 (9th Cir. 2007); Hansen v. Black, 885 F.2d 642, 646

3    (9th Cir. 1989).

4         Pursuant to these standards, the court finds that defendant's apparently exclusive authority

5    in establishing the challenged policies pursuant to his Memorandum issued March 18, 2010, and

6    reflected in the DOM, Art. 51, § 54080.14, effective July 13, 2010 – and as reflected in the March

7    immediate implementation of his plan by subordinates – satisfies the personal involvement

8    requirement for establishing individual liability under Section 1983.  Accord, Shabazz v.

9    Giurbino, 2014 WL 4344368, **1-3 (E. D. Cal. Aug. 28, 2014) ("The policy [Giurbino's Mar. 18,

10   2010 Memorandum] identified and upheld by all named Defendants is at the heart of Plaintiff's

11   complaint regarding the [RMAP], and these Defendants were personally involved in the alleged

12   constitutional violations[.]"); see also Mayweathers, 2011 WL 2746067 at *6, 2011 U.S. Dist.

13   LEXIS 76413 at *20 ("Plaintiff is . . . challenging . . . the substance of the decisions, which were

14   expressly based on CDCR policies" relied upon to deny plaintiff  Halal meat or, alternatively,

15   Kosher meat).

16        Nevertheless, for reasons later discussed, the court finds that defendant is entitled to

17   qualified immunity and therefore will recommend summary judgment for defendant on plaintiff's

18   damages claims.  Before turning to the qualified immunity issue, however, the court will address

19   the substance of plaintiff's claims and the state of the record before the court on summary

20   judgment.

21        B.  Plaintiff's Constitutional Claims Pursuant to 42 U.S.C. § 1983

22            1.  Establishment Clause Claim

23        Defendant moves for summary judgment on plaintiff's claim that requiring plaintiff to eat

24   vegetarian meals at breakfast and lunch, as a condition for obtaining an Halal entrée at dinner,

25   violates the First Amendment's proscription against the establishment of religion, because a

26   "[v]egetarian diet is an [sic] religious activity," and plaintiff "is not a vegetarian."  FAC at 6.

27   ////

28   ////

1  Defendant contends that CDCR's Vegetarian Diet neither advances nor inhibits religion,[13] and

2  meets the three-part test for evaluating an Establishment Clause claim set forth in Lemon v.

3  Kurtzman, 403 U.S. 602 (1971).

4        The First Amendment's Establishment Clause, applied to the states by the Due Process

5  Clause of the Fourteenth Amendment, prohibits governments from enacting a law "respecting an

6  establishment of religion."  U.S. Const. amend. I. "The clause 'means at least' that '[n]either a

7  state nor the Federal Government . . . can pass laws which aid one religion, aid all religions, or

8  prefer one religion over another.'"  Hartmann, 707 F.3d at 1125 (quoting Everson v. Board of

9  Education, 330 U.S. 1, 15 (1947)).  Thus, the Establishment Clause "'mandates governmental

10  neutrality between religion and religion, and between religion and nonreligion.'"  McCreary

11  County, Ky. v. ACLU, 545 U.S. 844, 860 (2005) (quoting Epperson v. Arkansas, 393 U.S. 97,

12  104 (1968)).  "The principle that government may accommodate the free exercise of religion does

13  not supersede the fundamental limitations imposed by the Establishment Clause, which

14  guarantees at a minimum that a government may not coerce anyone to support or participate in

15  religion or its exercise[.]"  Lee v Welsman, 505 U.S. 577, 577-78 (1992).

16  _____

17  [13]  Defendant also contends, inconsistently, that the Vegetarian Diet is Halal, but provides no
authority for this statement, which is contained in the record as follows: (1) The Giurbino

18  Memorandum expressly states that "The vegetarian option for breakfast and lunch meets halal
requirements."  See ECF No. 36 at 21.  (2) In contrast, the pertinent DOM provision provides

19  only that "Inmate participants in the RMAP shall receive the vegetarian option at breakfast and
lunch." See ECF No. 72-5 at 33.  (3) However, the HDSP Director's Level Decision on plaintiff's

20  relevant administrative grievance provides in pertinent part, see ECF No. 36 at 9-10:

21              The actions of allowing Jewish inmates to receive a kosher meal at
              breakfast and the Muslim[] inmate[s] to have a vegetarian meal are

22              not a discriminator[y] practice.  Both meals meet the religious
              requirements for the practicing inmate population.  Therefore, both

23              religious groups are afforded a religious meal consistent with their
              beliefs.

24

Because plaintiff does not assert that the Vegetarian Diet is Halal, defendant's statements to the

25  contrary are not material to the court's analysis of plaintiff's Establishment Clause claim.
Moreover, the appropriate reference for the Vegetarian Diet is the revised regulation that

26  established it, as discussed infra.  However, as discussed in the analysis of plaintiff's Free
Exercise claim, defendant's unsupported assertion that CDCR's Vegetarian Diet meets Halal

27  standards is one of several ways that defendant has failed to demonstrate that the RMAP meets
constitutional requirements.

28

1    The prevailing test for assessing whether a challenged policy violates the Establishment

2    Clause is set forth in Lemon, supra, 403 U.S. 602.[14]  In Lemon, the Supreme Court adopted the

3    following three-part test:  "First, the statute [or challenged policy] must have a secular legislative

4    purpose; second, its principal or primary effect must be one that neither advances nor inhibits

5    religion; finally, the statute [or challenged policy] must not foster an excessive government

6    entanglement with religion."  403 U.S. at 612-13 (citations and internal quotation marks omitted).

7    Defendant contends broadly that CDCR's Vegetarian Diet satisfies the Lemon test.

8    However, plaintiff does not challenge the Vegetarian Diet per se, but the requirement that he

9    obtain Vegetarian Diet meals at breakfast and lunch in order to obtain a Halal entrée at dinner.

10    Plaintiff's claim is that the RMAP's vegetarian-breakfast-and-lunch-policy violates the

11    Establishment Clause.  This policy is not set forth in the regulations, but in the Giurbino

12    Memorandum and in the DOM.

13    Application of the Lemon test to the RMAP's vegetarian-breakfast-and-lunch-policy fails

14    to demonstrate a violation of the Establishment Clause.  Despite plaintiff's protest that a

15    "vegetarian diet is a religious activity," CDCR's Vegetarian Diet was intentionally revised for the

16    express purpose of rendering it secular.  As now framed, the "Vegetarian Diet" is broadly offered

17    to all inmates for "religious, personal, or ethical dietary needs."  See 15 Cal. Code Regs. §

18    3054.1.  This revised regulation was enacted as a deliberate modification of CDCR's former

19    "Religious Vegetarian Diet," and thus demonstrates an inherently secular legislative purpose,

20    satisfying the first prong of the Lemon test.

21    Under Lemon's "primary effect" second prong, "[w]hat is crucial is that a government

22    practice not have the effect of communicating a message of government endorsement or

23    disapproval of religion."  Lynch v. Donnelly, 465 U.S. 668, 692 (1984) (O'Connor, J.,

24    concurring).  Because the revised Vegetarian Diet is secular by definition, requiring RMAP

25    participants to obtain vegetarian meals when RMA meals are unavailable conveys no greater

26

27    ---
    [14]  But see Barnes-Wallace v. City of San Diego, 704 F.3d 1067, 1082-83 (9th Cir. 2012) ("The
    Lemon test has recently led a checkered existence.")

28

endorsement of religion that if the alternate meals were regular food trays.  The revised "reason blind" nature of the Vegetarian Diet disavows the endorsement of any religion that may be premised on, or find expression in, a vegetarian diet.  Because the RMAP's vegetarian-breakfast-and-lunch-policy neither advances nor inhibits religion, the second prong of the Lemon test is met.

Finally, because obtaining a CDCR vegetarian meal is not an inherently religious activity, the government is not entangled in religious expression or administration by requiring RMAP participants to obtain the Vegetarian Diet at breakfast and lunch, thus satisfying the third and final prong of the Lemon test.

For these reasons, the undersigned recommends that summary judgment be granted to defendant on the merits of plaintiff's Establishment Clause claim.

## 2.  Free Exercise Claim

In the FAC, plaintiff contends that the denial of his request for a fully Kosher diet (because a fully Halal diet is not available) violates his First Amendment right to freely exercise his religion.  See FAC, ECF No. 36 at 3-4.  Plaintiff explains that "[t]o allow CDC to infringe on Mr. Robinson's free exercise of religion without similar infringement to other faiths tend to show favor to other faiths or disdain for the Islamic faith."  Id. at 4.  At his deposition, plaintiff contended that the denial of his request for a fully Halal diet or, alternatively, a fully Kosher diet, violates his free exercise rights under the First Amendment.  See Pl. Depo. at 56:7-11, 23-4; 57:17- 58:6; 58:24-59:1-3, 7.

Defendant moves for summary judgment on plaintiff's free exercise claim on the ground that CDCR's provision of the RMAP-Vegetarian Diet in lieu of a fully Halal diet or fully Kosher diet is reasonably related to legitimate penological interests.[15]  The court's analysis proceeds under Turner v. Safley, 482 U.S. 78 (1987).  Pursuant to Circuit authority reversing summary

---

[15]  In focusing on the constitutionality of the RMAP per se, defendant conflates plaintiff's alternate requests for a fully Halal diet and fully Kosher diet, as well as plaintiff's arguments that neither the Religious Meat Alternate food nor vegetarian food are necessarily Halal, and that plaintiff should obtain Halal meat at the same frequency that non-Muslim inmates are served meat.  These problems persist throughout defendant's briefing.

1  judgment in analogous cases, the court concludes that there remain triable issues related to the

2  Turner analysis.

3            a.  Legal Standards for Assessing a Free Exercise Claim

4       "Inmates clearly retain protections afforded by the First Amendment . . . including its

5  directive that no law shall prohibit the free exercise of religion."  O'Lone v. Estate of Shabazz,

6  482 U.S. 342, 348 (1987) (citations omitted).  Nevertheless, "[l]awful incarceration brings about

7  the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the

8  considerations underlying our penal system."  Id., 482 U.S. at 348.  "Inmates . . . have the right to

9  be provided with food sufficient to sustain them in good health that satisfies the dietary laws of

10  their religion."  McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987).

11       To implicate the Free Exercise Clause, plaintiff must demonstrate that prison officials

12  substantially burdened the free exercise of his religion by preventing him from engaging in

13  conduct which he sincerely believes is consistent with his faith.  Shakur v. Schriro, 514 F.3d 878,

14  884-85 (9th Cir. 2008).  The underlying religious belief must be "sincerely held."  Malik v.

15  Brown, 16 F.3d 330, 333 (9th Cir. 1994); see also Shakur, 514 F.3d at 884-85 (noting that the

16  "sincerity test," not the "centrality test," applies to a free exercise analysis).

17       Plaintiff must also demonstrate that the burden on the free exercise of his sincerely held

18  religious beliefs is substantial.  "In order to reach the level of a constitutional violation, the

19  interference with one's practice of religion must be more than an inconvenience; the burden must

20  be substantial[.]"  Freeman v. Arpaio, 125 F.3d 732, 736 (9th Cir. 1997) (citation and internal

21  quotation marks omitted), overruled in part on other grounds by Shakur, 514 F.3d at 884-85.  A

22  substantial burden exists where the state "put[s] substantial pressure on an adherent to modify his

23  behavior and to violate his beliefs[.]"  Thomas v. Review Board, 450 U.S. 707, 718 (1981).

24       A prison policy that substantially burdens a prisoner's right to freely exercise his religion

25  will be upheld only if it is reasonably related to a legitimate penological interest.  Id.  As

26  explained by the Ninth Circuit in Shakur, the following four factors, identified by the Supreme

27  Court in Turner v. Safley, supra, must be balanced in determining whether a prison regulation is

28  reasonably related to a legitimate penological interest:

1                   (1) Whether there is a valid, rational connection between the prison
2                   regulation and the legitimate governmental interest put forward to
justify it;

3                   (2) Whether there are alternative means of exercising the right that
remain open to prison inmates;

4

5                   (3) Whether accommodation of the asserted constitutional right will
impact guards and other inmates, and on the allocation of prison
resources generally; and

6

7                   (4) Whether there is an absence of ready alternatives versus the
existence of obvious, easy alternatives.

8

9     Shakur, 514 F.3d at 884 (citing Turner, 482 U.S. at 89-90) (internal quotation marks and citation

10    omitted).

11                b.  Analysis of Turner Factors

12         Defendant does not challenge plaintiff's testimony that he sincerely believes eating Halal

13    food, as exclusively as possible, is essential to his faith, or that, in the absence of a fully Halal

14    diet, a fully Kosher diet provides meals most closely aligned with his faith.  Nor does defendant

15    refute plaintiff's testimony that the unavailability of a fully Halal or fully Kosher diet imposes a

16    substantial burden on the exercise of his sincerely held religious beliefs.  Defendant instead

17    focuses on the Turner analysis.

18                   i.  Rational Connection Between Challenged Policies and Penological

19                    Interests

20         The first Turner factor requires the court to examine whether there is a "valid, rational

21    connection" between the challenged prison policy and the "legitimate governmental interest put

22    forward to justify it."  Turner, 482 U.S. at 89 (citation and internal quotation marks omitted).

23    The challenged policy "cannot be sustained where the logical connection between the regulation

24    and the asserted goal is so remote as to render the policy arbitrary or irrational.  Moreover, the

25    governmental objective must be a legitimate and neutral one."  Id. at 89-90.

26         Defendant asserts that the first Turner factor is satisfied by CDCR's "legitimate interest in

27    running a simplified food service," Ward v. Walsh, 1 F.3d 873, 877 (9th Cir. 1992), while

28    meeting the individual food preferences of its inmates.  Defendant asserts that "by offering a halal

1   meat alternative with dinner . . . CDCR is able to accommodate the religious dietary needs of

2   Muslim inmates," and "by offering the Vegetarian Diet, CDCR is able to accommodate the

3   religious dietary needs of Muslim inmates and also the needs of inmates with ethical and personal

4   objections to eating meat."  MSJ, ECF No. 72-2 at 7.  Defendant contends that the RMAP, in

5   tandem with the Vegetarian Diet, enables CDCR "to accommodate the religious dietary needs of

6   all Muslim inmates in a secure and cost-effective manner."  ECF No. 82 at 3.  Thus, concludes

7   defendant, "there is a valid rational connection between the RMAP and Vegetarian Diet and

8   CDCR's interest in reasonably accommodating the dietary needs of its inmate population."  MSJ,

9   ECF No. 72-2 at 7.

10      Plaintiff asserts in opposition that "the legitimate interest of running a simplified food

11   service process should be obsolete because CDCR has already in place a simplified food service

12   process under the Jewish Kosher Diet Program that meets the same criteria o[f] [the] Halal Diet

13   Program and most of the foods may be halal for the Plaintiff to consume."  Oppo., ECF No. 79 at

14   6.

15      Defendant responds only that "[p]laintiff's argument does not acknowledge the reality that

16   thousands of inmates have religious dietary needs that must be met."  Reply, ECF No. 82 at 4.

17      Defendant has provided no substantive evidence in support of his assertion that the

18   RMAP-Vegetarian Diet provides a "simplified food service process" for Muslim inmates, as

19   compared to the food service process supporting Jewish inmates in the JDKP, or other inmates

20   with regular diet plans.  Nor has defendant provided any evidence comparing the simplicity or

21   efficiency of providing the RMAP-Vegetarian Diet to Muslim inmates, instead of allowing

22   Muslim inmates to have fully Kosher diets within the JKDP if they so request.  Nevertheless, case

23   law supports a finding that the first Turner factor weighs slightly in defendant's favor.

24      In Ward, despite remanding the case for specific findings on the second, third and fourth

25   Turner factors, the Ninth Circuit found that "[t]he prison has a legitimate interest in running a

26   simplified food service, rather than one that gives rise to many administrative difficulties.  Since

27   the policy of not providing special diets is related to simplified food service, the first [Turner]

28   factor weighs in favor of the government."  Ward, 1 F.3d at 877 (citation omitted); accord,

1    <u>Sefeldeen v. Alameida</u>, 238 Fed. Appx. 204, 206 (9th Cir. 2007) ("the legitimate governmental

2    interest [] to reasonably accommodate thousands of inmates' religious dietary needs while also

3    considering budgetary, staff, and security limitations" satisfies the first <u>Turner</u> factor).

4         Similarly, in <u>Shakur</u>, despite remanding the case for specific findings on the third and

5    fourth <u>Turner</u> factors, the Ninth Circuit found that "the reduction of administrative and budgetary

6    burdens" were legitimate penological interests upon which the Arizona Department of

7    Corrections (ADOC) "could rationally conclude that denying Muslim prisoners kosher meals

8    would simplify its food service and reduce expenditures."  <u>Shakur</u>, 514 F.3d at 885-86.

9    "Although the marginal cost and administrative burden of adding [plaintiff] to the roster of

10   kosher-diet inmates would be small or even negligible, we cannot conclude that no rational nexus

11   exists between ADOC's dietary policies and its legitimate administrative and budgetary concerns.

12   . . . Hence, the first <u>Turner</u> factor weighs slightly in favor of ADOC."  <u>Id.</u> at 886.

13        Pursuant to these cases, the court finds that CDCR's legitimate interests in minimizing

14   costs and operating a simplified food service program are rationally related to the maintenance of

15   its current diet options, including maintenance of the RMAP-Vegetarian Diet as the only diet

16   option available to Muslim inmates.  Therefore, the court finds that the first <u>Turner</u> factor weighs

17   slightly in defendant's favor in maintaining the status quo.

18                    ii.  <u>Alternate Means for Plaintiff to Practice His Religion</u>

19        "The second <u>Turner</u> factor requires us to consider whether [plaintiff] has alternative

20   means by which he can practice his religion.  The relevant inquiry under this factor is not whether

21   the inmate has an alternative means of engaging in the particular religious practice that he or she

22   claims is being affected; rather, we are to determine whether the inmates have been denied all

23   means of religious expression."  <u>Ward</u>, 1 F.3d at 877 (citing <u>O'Lone</u>, 482 U.S. at 351-52).

24        Plaintiff testified that, diet aside, he practices his religion in several ways, including

25   reading the Quran, Sunnah and Hadith, Pl. Depo. at 14:23-4; regularly attending the religious

26   services Jummah and Talim, <u>id.</u> at 30:22-31:18; and observing the religious holy days Ramadan

27   and Eid A-Fitr, <u>id.</u> at 31:19-21:4.  Plaintiff does not contend that he is restricted in any of these

28   activities, or that he is otherwise circumscribed in practicing his religion.  Plaintiff's ability "to

1    participate in other religious observances" of his faith supports the second <u>Turner</u> factor.  <u>O'Lone</u>,

2    482 U.S. at 352; <u>see also</u> <u>Shakur</u>, 514 F.3d at 886.

3          Accordingly, the court finds that the second <u>Turner</u> also weighs in defendant's favor.

4                            iii.   <u>Impact of Accommodation</u>

5          The third <u>Turner</u> factor examines "the impact that accommodation of [plaintiff's]

6    asserted right would have on other inmates, on prison personnel, and on allocation of prison

7    resources generally."  <u>O'Lone</u>, 482 U.S. at 352 (citing <u>Turner</u>, 482 U.S. at 90).  "When

8    accommodation of an asserted right will have a significant 'ripple effect' on fellow inmates or on

9    prison staff, courts should be particularly deferential to the informed discretion of corrections

10   officials."  <u>Turner</u>, 482 U.S. at 90 (citation omitted).

11         Defendant contends that "[g]iven the number of inmates in the custody of CDCR, and

12   the wide variety of religions practiced by them, there could be a significant 'ripple effect' if

13   Plaintiff is offered a halal meat alternative at every meal when he concedes that his religion does

14   not require him to eat meat at every meal.  The potential for other inmates to demand meat at

15   every meal when their religion does not require it weighs in Defendant's favor as to the third

16   <u>Turner</u> factor."  MSJ, ECF No. 72-2 at 7.

17         Defendant misconstrues plaintiff's asserted right – he is not seeking Halal *meat* at every

18   meal; rather he is seeking a fully Halal *diet*, served in a sealed tray, with meat provided at the

19   same frequency it is provided to other inmates.  Alternatively, plaintiff seeks a Kosher diet.

20         Plaintiff responds, Oppo., ECF No. 79 at 7:

> CDCR already has a simplified food service process in the CDCR
> Kosher Meal Provision Plan enacted via the <u>Cooper</u> settlement,
> <u>Cooper v. California</u>, No. 3:02-cv-03712 JSW.[16]   This provision
> meets halal requirement[s].  Providing Plaintiff with a Halal diet
> equivalent to a Jew does not jeopardize[] the safety or security of
> any institution, facility, staff, inmates and or the public.

---

[16]  In <u>Cooper v. California</u>, Case No. 3:02-cv-03712 JSW P, the United States District Court for
the Northern District of California, on December 18, 2003, approved a settlement agreement that
provided, in pertinent part, that CDCR would, within two years, provide kosher meals to all
CDCR kosher-observant Jewish inmates, ideally through implementation of a state-wide Kosher
Diet Program.  <u>See</u> <u>id.</u>, ECF No. 57.

1    In reply, defendant again misconstrues plaintiff's asserted right.  Defendant asserts,

2    "[p]laintiff offers no argument on the potential for detrimental impact on CDCR's operations.

3    Instead, Plaintiff's opposition argues that because Jewish inmates receive Kosher meals for

4    breakfast, lunch, and dinner, he should receive meat at all three meals as well."  Reply, ECF No.

5    82 at 5.

6    In Shakur, the Ninth Circuit found insufficient record evidence and district court findings

7    in support of Turner's third and fourth factors, and remanded for further findings on these

8    matters.  In considering the third Turner factor, the Ninth Circuit considered the arguments of

9    defendant ADOC that accommodating Shakur's request for a Kosher diet "could look like

10   favoritism to other inmates and could lead to a hostile prison environment," and "lead inmates to

11   request diets that their religions did not require, increasing ADOC's costs for meals by exorbitant

12   amounts."  Shakur, 514 F.3d at 886 (internal quotation marks omitted).  The Ninth Circuit

13   discounted the favoritism argument, noting that this effect "'is present in every case that requires

14   special accommodations for adherents to particular religious practices.'"  Id. (quoting Ward, 1

15   F.3d at 878).  Pursuant to Shakur and Ward, the court discounts defendant's favoritism argument

16   here.

17   Additionally in Shakur, ADOC provided only the affidavit of its Pastoral Administrator in

18   support of its assertion that accommodating plaintiff's request for Halal or Kosher meals would

19   increase ADOC's costs "by exorbitant amounts."  The Ninth Circuit criticized the affidavit's

20   "conclusory assertion that providing all 850 of its Muslim prisoners with kosher meals would cost

21   'an additional $1.5 million annually,' and providing them with Halal meat would 'be in the

22   millions of dollars annually.'"  Id. at 887.  The court found no evidentiary support for these

23   statements, noting as follows, id.:

24                    There is no evidence in the record suggesting that ADOC actually
                      looked into providing kosher meat to all Muslim prisoners, which
25                    could potentially result in economies of scale that would reduce the
                      overall cost of the meals.  Moreover, there is no indication that
26                    ADOC investigated suppliers of Halal meat, solicited bids or price
                      quotes, or in any way studied the effect that accommodation would
27                    have on operating expenses.  Finally, there is no indication that
                      other Muslim prisoners would demand kosher meals if Shakur's
28                    request were granted.

The Ninth Circuit concluded that it was unable to determine whether ADOC could prevail on the third <u>Turner</u> factor without further findings.  <u>Shakur</u>, 514 F.3d at 886-87 (citing <u>Ward</u>, 1 F.3d at 878-79).

Previously, in <u>Ward</u>, the Ninth Circuit found insufficient evidence to support the general statements offered by a Nevada Warden that granting plaintiff's request for a Kosher diet would result in prohibitive increased costs.  After acknowledging but minimizing the Warden's favoritism argument, the Ninth Circuit found, 1 F.3d at 878-79:

> More important are the administrative difficulties that could potentially arise in accommodating Ward's request.  Common sense tells us that there would be some disruption to the efficient operation of culinary services if the prison were required to provide a special meal for one prisoner.  The district court, however, made no findings regarding how great the disruption would be.  Indeed, the district court made no findings regarding whether the prison had explored the possibility of accommodating Ward.  Although we must give deference to the prison official's own assessment of the burden on prison operations, we cannot simply accept the warden's assertion on appeal that the disruption would be significant.  Likewise, the district court made no findings regarding the financial impact of accommodation.  Again, it is clear that providing a kosher diet would give rise to some expense, not only from the cost of Ward's meals but also from the cost of accommodating others with similar claims of entitlement to a religious diet.  We cannot determine how heavily this factor weighs in the prison's favor, however, because the magnitude of these costs is a factual question for which the district court made no findings.

Similarly, in the present case, defendant has offered no evidence concerning the relative costs associated with providing plaintiff alone with a fully Kosher diet or a fully Halal diet, in lieu of the RMAP-Vegetarian Diet, nor any statistics showing the number of Muslim inmates who might pursue either of these options if plaintiff prevailed.[17]  Defendant has provided no

---

[17]  By way of comparison, the following statistical information was provided in <u>McCollum v. CDCR</u>, 647 F.3d 870, 875 (9th Cir. 2011), as reiterated by the Ninth Circuit in <u>Hartmann</u>, <u>supra</u>, 707 F.3d at 1126:

> According to a 2002 CDCR survey, there were approximately 598 Wiccan inmates in custody . . . This number compares to 20,901 Protestant inmates, 11,351 Catholic inmates, 1,773 Muslim inmates, 1,482 Native American inmates, 306 Jewish inmates, and 4,155 inmates identified as "other."  In September 2007, the inmate survey indicated 42,666 Protestant inmates, 28,884 Muslim

(continued…)

1  declarations from any CDCR administrator or Correctional Food Manager addressing the costs

2  associated with purchasing, storing, preparing and serving any type of inmate meal.

3      In light of the absence of any evidence demonstrating the logistical and financial impacts

4  of accommodating plaintiff's requests for a fully Halal or fully Kosher diet, the court is unable to

5  assess the merits of the third Turner factor.  As in Shakur and Ward, further evidentiary

6  development is required to enable this court to make specific findings concerning the impact of

7  accommodating plaintiff's requests on other inmates, correctional staff, and prison resources

8  generally.

9                    iv.  Readily Available Alternatives

10     The fourth Turner factor requires courts to consider whether there is an "absence of ready

11 alternatives" to the challenged prison policy.  Turner, 482 U.S. at 90.  This factor requires the

12 court to consider whether "there are ready alternatives to the prison's current policy that would

13 accommodate [plaintiff ] at de minimis cost to the prison."  Ward, 1 F.3d at 879.  The "existence

14 of obvious, easy alternatives may be evidence that the [challenged policy] is not reasonable, but is

15 an 'exaggerated response' to prison concerns."  Turner, 482 U.S. at 90; see also Shakur, 514 F.3d

16 at 887.  The burden is on plaintiff to show that there are obvious, easy alternatives to the

17 challenged policy.  O'Lone, 482 U.S. at 350.

18     Defendant contends that plaintiff cannot meet this burden because, "[i]n his deposition, he

19 conceded that the Vegetarian Diet is an acceptable alternative for Muslim inmates.  He also

20 testified that the Kosher Diet would not be an acceptable option."  MSJ, ECF No. 72-2 at 8;

21 Reply, ECF No. 82 at 5.  Defendant directs the court to excerpts of plaintiff's deposition.  See

22 MSJ, Ex. A, ECF No. 72-4 at 11-12.  Defendant misconstrues plaintiff's testimony.  Review of

23 the cited testimony, in the context of defendant's related questioning and plaintiff's complete

24 deposition testimony and briefing in this action, demonstrates that plaintiff believes vegetarian

25 food is permissible to eat "if it's Halal," but he does not want an exclusively vegetarian diet.

26 _____

27 inmates, 23,160 Catholic inmates, 8,296 Native American inmates, 3,296 Jewish inmates, 183 Wiccan inmates, and 2,678 inmates identified as "other."

28

1   Plaintiff testified that his faith requires (and that he physically requires) that he eat meat, and

2   seeks Halal meat with same frequency as other inmates are served meat.  In the absence of a fully

3   Halal diet, plaintiff clearly seeks a fully Kosher diet, although he acknowledges it may not meet

4   all the requirements of Halal.

5          Defendant has submitted no other evidence in support of the fourth <u>Turner</u> factor.

6          In contrast, as earlier noted, plaintiff attempts to meet his burden of demonstrating that

7   there is an obvious, easy alternative to the RMAP-Vegetarian Diet – namely the fully Kosher diet

8   offered by the existing JKDP.  <u>See</u> Oppo., ECF No. 79 at 7 ("CDCR already has a simplified food

9   service process in the CDCR Kosher Meal Provision Plan . . . . This provision meets halal

10  requirements.").  Plaintiff avers that his participation in the JKDP would "not jeopardize the

11  safety or security of any institution, facility, staff, inmates and or the public."  <u>Id</u>.  However,

12  plaintiff has no access to information concerning the actual logistical and financial impacts of

13  authorizing this alternative.

14         In <u>Shakur</u>, the Ninth Circuit found that it "cannot determine whether the alternative kosher

15  diet requested by Shakur places more than a de minimis burden on ADC."  <u>Shakur</u>, 514 F.3d at

16  888.  Again noting that the district court had made insufficient findings concerning the costs and

17  feasibility of providing plaintiff with Kosher meals, requiring remand, the Ninth Circuit observed,

18  <u>id.</u> at 887:

19                  [T]he fact that ADC already provides Jewish inmates with kosher
                    meals that cost $5 per day more than the standard meal, and
20                  orthodox kosher meals that cost three to five times more, "casts
                    substantial doubt on [its] assertion that accommodating [Shakur's]
21                  request would result in significant problems for the prison
                    community."  <u>DeHart [v. Horn]</u>, 227 F.3d [47] at 58 [3rd Cir.
22                  2000); <u>see also</u> <u>Ashelman v. Wawrzaszek</u>, 111 F.3d 674, 678 (9th
                    Cir. 1997) ("The evidence also shows that the prison accommodates
23                  the dietary requirements of other religious groups . . .  without
                    disruption.  Under these circumstances, it does not appear that the
24                  difficulties envisioned by the prison are insurmountable.").

25  <u>See also</u> <u>Ward</u>, 1 F.3d at 879 (remanding for further development of the record on <u>Turner</u>'s fourth

26  factor because, "[o]n the record before us, we simply are unable to determine whether reasonable

27  alternatives to this policy exist . . . . The district court . . . made no findings regarding the

28  feasibility of such alternatives [and] we cannot speculate about their existence or the impact they

1  would have on culinary services.").

2      In the present case, defendant has provided no relevant evidence.  Based on this record,

3  the court is unable to assess the merits of the fourth <u>Turner</u> factor.  Further evidentiary

4  development is required in order for this court to determine whether the existing JKDP is an

5  obvious, easy alternative to the RMAP-Vegetarian Diet and a reasonable, feasible

6  accommodation to plaintiff's sincerely held religious beliefs.

7          c. <u>Summary of Free Exercise Analysis</u>

8      In the absence of any significant evidence relative to the third and fourth <u>Turner</u> factors,

9  the court declines to speculate whether CDCR is precluded by the practical considerations

10 reflected in those factors from according plaintiff a Kosher or fully Halal diet.  While the first and

11 second <u>Turner</u> factors weigh in defendant's favor, the court cannot make a determination on the

12 third and fourth <u>Turner</u> factors.  As the Ninth Circuit concluded in <u>Shakur</u>, absent an adequate

13 record permitting full assessment of these factors, the court cannot determine the merits of

14 plaintiff's First Amendment Free Exercise claim.  <u>Accord</u>, <u>Mayweathers</u>, <u>supra</u>, 2011 WL

15 2746067 at *9-10, 2011 U.S. Dist. LEXIS 76413 at *28-30.

16     Because defendant has not produced evidence sufficient to support judgment in his favor,

17 and because significant material factual disputes remain, defendant's motion for summary

18 judgment on the merits of plaintiff's Free Exercise claim should be denied.

19          3. <u>Equal Protection Claim</u>

20     Plaintiff contends that he, a Muslim observant of Islamic Dietary Laws, is not accorded

21 the same opportunity to practice his religious beliefs as Jewish inmates, in violation of the

22 Fourteenth Amendment's Equal Protection Clause.  Jewish inmates receive fully Kosher foods at

23 each meal, in covered trays to prevent cross-contamination with non-Kosher foods.  Plaintiff,

24 under the RMAP, receives a Halal entrée at dinner only, on the same tray as Haram food, and the

25 Vegetarian Diet at lunch and dinner.  Plaintiff seeks a fully Halal diet or, alternatively, a fully

26 Kosher diet, which he asserts is religiously acceptable to him, as set forth in his FAC, ECF No. 36

27 at 5:

28
         Mr. Robinson is similarly situated as an (sic) Jewish inmate, their
         dietary needs are similar and the difference between the two faiths

38

1
2
3

> are a matter of doctrine not dietary.  If this is accurate then how can Mr. Robinson be unlawfully denied his religious dietary practice while a similar situated inmate with the same religious dietary practice is allowed to practice his.

Defendant moves for summary judgment on this claim based on the following, Reply,

ECF No. 82 at 6:

> Plaintiff's argument fails to establish that CDCR or Defendant intentionally discriminated against Plaintiff in violation of his Fourteenth Amendment rights.  The mere fact that the RMAP and the Jewish Kosher Diet Plan are different does not establish a Fourteenth Amendment violation without some showing that Defendant or CDCR intended to discriminate against Plaintiff's religion.  The undisputed facts show that CDCR's revised religious diet program was intended to promote the practice of Islam by offering a reasonable diet plan for Muslim inmates.

The Equal Protection Clause of the Fourteenth Amendment provides that no state shall

"deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend.

XIV.  This directive establishes the rule that "all persons similarly situated should be treated

alike."  City of Cleburne v. Cleburne Living Center, 473 U.S. 432, 439 (1985).  Prisoners are

protected by the Equal Protection Clause from intentional discrimination based upon their

religion.  Shakur, 514 F.3d at 891.  However, prisons are not required to provide identical

resources to different religions.  They need only make a "good faith accommodation of the

[prisoner's] rights in light of practical considerations."  Allen v. Toombs, 827 F.2d 563, 569 (9th

Cir. 1987) (citation omitted); accord, Freeman, 125 F.3d at 737.

"'To state a claim under 42 U.S.C. § 1983 for a violation of the Equal Protection Clause

of the Fourteenth Amendment a plaintiff must show that the defendants acted with an intent or

purpose to discriminate against the plaintiff based upon membership in a protected class.'"

Furnace v. Sullivan , 705 F.3d 1021, 1030 (9th Cir. 2013) (quoting Barren v. Harrington, 152

F.3d 1193, 1194 (9th Cir.1998)).  Focusing on this requirement of discriminatory intent,

defendant argues that neither the RMAP nor the Vegetarian Diet are so premised, MSJ, ECF No.

72-2 at 9:

> [T]he RMAP was a good faith accommodation of the religious needs of Muslim inmates in light of the practical considerations of operating such a large scale food service program.  Rather than

attempting to design a variety of specialized diets for each inmate
or group of inmates who seek to exclude meat from their diets,
CDCR's Vegetarian Diet is designed to accommodate and honor
the religious and non-religious needs of its inmate population.

However, the appropriate analysis for assessing the merits of a prisoner's Equal Protection

claim turns not on defendant's intent but on whether the resulting disparate policy is reasonably

related to legitimate penological interests, as determined pursuant to a Turner analysis. DeHart v.

Horn, 227 F.3d 47, 61 (3rd Dist. 2000), cited with approval by the Ninth Circuit in Shakur, 514

F.3d at 891. "Under the Turner test, [plaintiff] cannot succeed 'if the difference between the

defendants' treatment of him and their treatment of Jewish inmates is "reasonably related to

legitimate penological interests."' DeHart, 227 F.3d at 61 (quoting Clark v. Groose, 36 F.3d 770,

773 (8th Cir. 1994))." Shakur, 514 F.3d at 891. "Prisoners enjoy religious freedom and equal

protection of the law subject to restrictions and limitations necessitated by legitimate penological

interests." Freeman, 125 F.3d at 737 (citing Bell v. Wolfish, 441 U.S. 520, 545-46 (1979)).

Given the absence of sufficient evidence to support a conclusion under Turner in the Free

Exercise context, the court is also unable to determine whether limiting plaintiff to the RMAP-

Vegetarian Diet is reasonably related to legitimate penological interests under plaintiff's Equal

Protection claim. As found by the district court in Hudson v. Maloney, 326 F. Supp.2d 206, 213-

14 (D. Mass 2004) (quoted with approval in Shakur, 514 F.3d at 892):

Conspicuously absent from the pleadings is any material
establishing in a competent way that no "consistent and reliable"
source of Halal meat is available to the Department, that the costs
of providing meals with Halal meat would in fact be two or three
times that of the existing standard and vegetarian menus, or any
analysis of the comparative costs of providing Kosher and Halal
meals. Without this information, the court is in no position to
determine whether the defendants are able to discharge their burden
under Turner of showing that their refusal to provide Muslim
inmates with a diet including Halal meat is based on a legitimate
penological interest sufficient to overcome the plaintiffs' free
exercise and equal protection claims.

See also Shakur, 514 F.3d at 891 (reversing district court's grant of summary judgment for

defendant on plaintiff's Equal Protection claim due to inadequate Turner findings, noting that

"[f]urthermore, it is not at all clear that the prison's purported cost justification is even valid given

1  the large expense it already undertakes to provide its Jewish inmates with costly kosher meals

2  (and in some cases, even costlier orthodox kosher meals).”); accord, Mayweathers, supra, 2011

3  WL 2746067 at *11, 2011 U.S. Dist. LEXIS 76413 at *33-5 (denying summary judgment on

4  plaintiff’s Equal Protection and Free Exercise claims due to lack of evidence on the third and

5  fourth Turner factors).

6      Accordingly, because material factual disputes remain whether legitimate penological

7  interests justify CDCR’s disparate treatment of Muslims concerning their observation of Islamic

8  dietary laws, defendant’s motion for summary judgment on the merits of plaintiff’s Equal

9  Protection claim should be denied.

10      4. Qualified Immunity on Section 1983 Damages Claims

11      The RMAP, as implemented by the Giurbino Memorandum, may or may not have struck a

12  constitutionally acceptable balance between plaintiff’s religious dietary needs and legitimate

13  institutional considerations.  For the reasons already explained, that question cannot be answered

14  on the present record.  However, the question remains whether the doctrine of qualified immunity

15  protects defendant Giurbino from individual liability in the event that a constitutional violation is

16  ultimately found.

17      “Qualified immunity is an affirmative defense to damage liability; it does not bar actions

18  for declaratory or injunctive relief.”  Presbyterian Church (U.S.A.) v. United States, 870 F.2d

19  518, 527 (9th Cir. 1989); see also Vance v. Barrett, 345 F.3d 1083, 1091 n.10 (9th Cir. 2003) (“a

20  defense of qualified immunity is not available for prospective injunctive relief”); accord,

21  Thornton v. Brown, 757 F.3d 834, 839 (9th Cir. 2013).  Accordingly, plaintiff’s Section 1983

22  claims should go forward insofar as plaintiff seeks declaratory and injunctive relief.  Defendant’s

23  damages liability is another matter.

24      “Qualified immunity shields government officials from civil damages liability unless the

25  official violated a statutory or constitutional right that was clearly established at the time of the

26  challenged conduct.”  Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (citing Ashcroft v. al-

27  Kidd, 131 S. Ct. 2074, 2080 (2011)).  In analyzing a qualified immunity defense, the court must

28  consider the following: (1) whether, viewed in the light most favorable to plaintiff, the alleged

41

1   facts demonstrate that defendant's conduct violated a constitutional right and (2) whether the right

2   at issue was clearly established at the time of the incident and "in light of the specific context of

3   the case." Saucier v. Katz, 533 U.S. 194, 201 (2001), overruled on other grounds by Pearson v.

4   Callahan, 555 U.S. 223 (2009). These questions may be addressed in the order most appropriate

5   to "the circumstances in the particular case at hand." Pearson, 555 U.S. at 236. In the present

6   case, the dispositive issue is the second one.

7        A correctional official "enjoys qualified immunity . . . unless he has violated a 'clearly

8   established' right, such that 'it would [have been] clear to a reasonable officer that his conduct

9   was unlawful in the situation he confronted.'" Kingsley v. Hendrickson, 135 S. Ct. 2466, 2474

10  (June 22, 2015) (quoting Saucier, 533 U.S. at 202). "[W]hether an official protected by qualified

11  immunity may be held personally liable for an allegedly unlawful official action generally turns

12  on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were

13  'clearly established' at the time it was taken." Anderson v. Creighton, 483 U.S. 635, 639 (1987)

14  (citation omitted). The determination whether a right was clearly established "must be

15  undertaken in light of the specific context of the case, not as a broad general proposition."

16  Saucier, 533 U.S. at 201. "The contours of the right must be sufficiently clear that a reasonable

17  official would understand that what he is doing violates that right. This is not to say that an

18  official action is protected by qualified immunity unless the very action in question has

19  previously been held unlawful; but it is to say that in the light of pre-existing law the

20  unlawfulness must be apparent." Anderson, 483 U.S. at 640 (citations omitted).

21        The Supreme Court has defined "clearly established" as follows:

22              To be clearly established, a right must be sufficiently clear that
                every reasonable official would [have understood] that what he is
23              doing violates that right. In other words, existing precedent must
                have placed the statutory or constitutional question beyond debate.
24              This "clearly established" standard protects the balance between
                vindication of constitutional rights and government officials'
25              effective performance of their duties by ensuring that officials can
                reasonably . . . anticipate when their conduct may give rise to
26              liability for damages.

27  Reichle, 132 S. Ct. at 2093 (citations and internal quotation marks omitted).

28        Although it is clearly established that "[i]nmates . . . have the right to be provided with

42

1   food sufficient to sustain them in good health that satisfies the dietary laws of their religion,"

2   McElyea, 833 F.2d at 198; see also Ward, 1 F.3d at 877, the contours of this right are determined

3   in any particular case by the specific accommodations requested and the penological justifications

4   for maintaining the status quo.  Defendant issued his Memorandum on March 18, 2010; the Ninth

5   Circuit Court of Appeals had issued its decision in Shakur, 514 F.3d 878, on January 23, 2008.

6   Shakur held in relevant part that the denial of a Kosher diet or Kosher meat to a Muslim inmate,

7   on the grounds that he is not Jewish, must be justified by legitimate institutional considerations.

8   See Shakur, 514 F.3d at 886-91.  Shakur did not address whether there is a clearly established

9   right for Muslim inmates to obtain Halal food.  Neither did the opinion hold that Muslim inmates

10  have to a right to a Kosher diet as an alternative to a Halal diet.  Shakur put prison officials on

11  notice (if further notice was needed) that Muslim inmates' requests for Halal and/or Kosher

12  dietary accommodation are subject to the Turner factors.  A reasonable prison official could

13  therefore have concluded that institutional budgetary and administrative considerations may

14  permissibly limit such accommodations.

15          Prior to Shakur, courts within this circuit expressly found that prison officials who refused

16  to provide Muslim inmates with a Halal diet were entitled to qualified immunity on the ground

17  that prisoners had no such clearly established right.  Thus, for example, in Lewis v. Ryan, 2008

18  WL 1944112 at *31, 2008 U.S. Dist. LEXIS 64335 (S.D. Cal. May 1, 2008), the district court

19  opined:

20              No party has presented, nor has the Court found, any Supreme
            Court or Ninth Circuit cases holding that Muslim prisoners have a
21          clearly established right to Halal meals, let alone to Halal meals that
            include properly prepared meat.  To date, the majority of circuit and
22          district courts that have looked at this specific issue have concluded
            there is no such clearly established right to Halal meals, with or
23          without Halal meat, under the First Amendment's Free Exercise of
            Religion Clause, RLUIPA, or the Equal Protection Clause of the
24          Fourteenth Amendment.

25  Lewis, 2008 WL 1944112 at *31 (collecting cases); accord, Thompson v. Williams, 320 Fed.

26  Appx. 678, 679 (9th Cir. 2009), cert. denied, 558 U.S. 1150 (Jan. 19, 2010) (defendants entitled

27  to qualified immunity "because it was not clearly-established at the time of the violation [2004

28  and 2005] that the defendants were required to provide [plaintiff] with either Halal or Kosher

43

1    meals with meat in lieu of an ovo-lacto [vegetarian] diet").

2          After Shakur, numerous district courts throughout the circuit have continued to find that

3    Muslim inmates' right to Halal meals or their Kosher equivalent is not clearly established.  See,

4    e.g., Johnson v. Nevada ex rel. Board of Prison Commissioners, 2013 WL 5428423 at *6, 2013

5    U.S. Dist. LEXIS 139426 at *18 (D. Nev. Sept. 26, 2013); McDaniels v. Elfo, 2013 U.S. Dist.

6    LEXIS 174301 at * 70-71 (W.D. Wash. Aug. 19, 2013).  Although some courts have expressed

7    different views,[18] and although the underlying constitutional questions remain open, this legal

8    landscape illustrates that there was nothing clearly established about the contours of the rights

9    plaintiff here seeks to enforce.  Certainly there was no clearly established constitutional right in

10   the Ninth Circuit for Muslim inmates to obtain Halal or Kosher diets.[19]  Accordingly, defendant is

11   _____

12   [18]  See, e.g., Collins v. Sisto, 2009 WL 2905860 at *5, 2009 U.S. Dist. LEXIS 81318 at *14 (E.D.
     Cal. Sept. 8, 2009) (prior to the implementation of the RMAP, the court found that "[a]

13   reasonable official would have known at the time plaintiff made his request that withholding a
     kosher meal from plaintiff was a constitutional violation.").  Collins was decided in the context of

14   a motion to dismiss for failure to state a claim.  Id.  That procedural posture is sufficiently distinct
     that Collins is not persuasive here.  See, e.g., Shabazz v. Giurbino, 2014 WL 4344368 at *6, 2014

15   U.S. Dist. LEXIS 121037 at *16 (E.D. Cal. Aug. 28, 2014) (qualified immunity, asserted as
     defense to Muslim inmate's challenge to RMAP, cannot be determined on motion to dismiss

16   because it hinges on facts yet to be developed).  Although the present evidentiary record in the
     case at bar does not support summary judgment on the substantive constitutional claims, it does

17   support a conclusion that a reasonable official in defendant's position could have believed
     legitimate penological goals supported the policy.

18   [19]  In the absence of clearly established precedent in our circuit, "[w]e may also look to the law of
     other circuits to determine if a principle is clearly established."  Tamas v. Dept. of Social &

19   Health Services, 630 F.3d 833, 846 (9th Cir. 2010) (citation omitted).  The court's review of
     relevant decisions in other circuits indicates that no court has found a clearly established right for

20   Muslim inmates to obtain fully Halal diets or, alternatively, Kosher diets.  See e.g. Robinson v.
     Jackson, 2015 WL 3650196 at *3, 2015 U.S. App. LEXIS 10208 at *7-9 (6th Cir. June 15, 2015)

21   (affirming summary judgment for defendants on plaintiff's claims that the refusal of the Ohio
     Department of Corrections to provide plaintiff with Halal meals, rather than vegetarian meals,

22   violated his free exercise rights, and that failing to provide Halal meals to Muslim inmates while
     providing Kosher meals to Jewish inmates violated his equal protection rights; the Sixth Circuit

23   relied on its "explicit holding" that "vegetarian meals are, in fact, Halal" (citing Abdullah v. Fard,
     No. 97–3935, 1999 WL 98529 at *1, 1999 U.S. App. LEXIS 1466 (6th Cir. Jan. 28, 1999))

24   (citing district court cases within Sixth Circuit); see also Patel v. U.S. Bureau of Prisons, 515 F.3d
     807, 815 (8th Cir. 2008) (Muslim inmate did not present "sufficient evidence from which a

25   reasonable factfinder could conclude that his right to exercise his religion was substantially
     burdened" by prison officials' failure to provide him a Halal diet, largely because plaintiff had the

26   option of purchasing Halal foods from the commissary); Baranowski v. Hart, 486 F.3d 112, 125-
     (continued…)

27

28

1   entitled to qualified immunity from damages even if the RMAP, as implemented, fails to

2   adequately respect plaintiff's free exercise or equal protection rights.

3       Jones v. Williams, 791 F.3d 1023, 1031 (9th Cir. 2015), does not require a contrary

4   conclusion.  In Jones, the Court of Appeals recently reversed a grant of qualified immunity to

5   defendant prison officials who had directed a Muslim inmate to personally handle pork as part of

6   his kitchen job duties.  The qualified immunity analysis in Jones is readily distinguishable from

7   the present case.  The inmate in Jones was affirmatively required to handle pork, conduct which a

8   reasonable officer would have known constituted "conduct directly violative of [the inmate's]

9   religious beliefs."  Id. at 1033.  Here, in contrast, plaintiff was not required to defile himself in a

10  way that would have been obvious to a reasonable administrator in defendant's position.  Plaintiff

11  was provided a diet free of pork, and including Halal meat, as part of a program specifically

12  intended to accommodate Muslim inmates' religious dietary needs.  The contours of the right

13  asserted by the Jones plaintiff, to be free from forced contact with a forbidden substance, were

14  clearly established.  Id.[20]  The right asserted here is a different one, and the Circuit has not clearly

15  established it.

16      For all the reasons explained above, the court finds that at the time of defendant's

17  challenged conduct, there was no clearly established constitutional right supporting plaintiff's

18  claims that he was entitled to obtain a fully Halal diet or, alternatively, a fully Kosher diet.  A

19  _____

20  26 (5th Cir. 2007) (holding that budgetary and security concerns justified the decision not to
    provide Kosher meals to a Jewish inmate); Abdullah v. Fard, 974 F. Supp. 1112, 1118-19 (N.D.

21  Ohio 1997) (finding no constitutional violation where a Muslim inmate was provided a
    "nutritionally adequate alternative" for a meat entree in lieu of Halal meat); Abdul–Malik v.

22  Goord, 1997 WL 83402 at *7-8, 1997 U.S. Dist. LEXIS 2047 at *21-9 (S.D.N.Y. Feb. 27, 1997)
    (finding that Muslim inmates' rights were not violated by the prison's failure to provide Halal

23  meat three times a week where a "Religious Alternative Menu" was available); Ali v. Denver
    Reception and Diagnostic Center, 82 F.3d 425 (Table) (10th Cir. 1996) (affirming in pertinent

24  part the district court's grant of qualified immunity to defendants "because the law was not
    clearly established that Plaintiff had a constitutional or statutory right to the Halal diet").

25  [20] Accord, Hayes v. Long, 72 F.3d 70, 74 (8th Cir. 1995) ("the right of Muslim inmates to refrain
    from handling pork has been clearly established"); Hunafa v. Murphy, 907 F.2d 46, 47-8 (7th Cir.

26  1990); Kenner v. Phelps, 605 F.2d 850, 850 (5th Cir. 1979) (per curiam); McEachin v.
    McGuinnis, 357 F.3d 197, 205 (2nd Cir. 2004); Williams v. Bitner, 455 F.3d 186, 191 (3rd Cir.

27  2006).

28

1   reasonable prison administrator in defendant's position would not have had reason to believe that

2   the RMAP, on its face or as implemented by the Giurbino Memorandum, was unconstitutional.

3   Accordingly, the court finds that qualified immunity shields defendant from liability for damages

4   on plaintiff's free exercise and equal protection claims.  The court therefore recommends that

5   these claims, as well as plaintiff's RLUIPA claim, should proceed only as claims for declaratory

6   and prospective injunctive relief.

7          C.  Religious Land Use and Institutionalized Persons Act (RLUIPA) Claim

8          Section 3 of RLUIPA provides that "[n]o government shall impose a substantial burden on

9   the religious exercise of a person residing in or confined to an institution . . . , even if the burden

10  results from a rule of general applicability," unless the government establishes that imposition of

11  the burden furthers "a compelling governmental interest" by "the least restrictive means."  42

12  U.S.C. § 2000cc-1(a), (b).  Section 3 applies "in any case" in which "the substantial burden is

13  imposed in a program or activity that receives Federal financial assistance."  Id., § 2000cc–

14  1(b)(1).  This standard is to be applied by the courts with "due deference to the experience and

15  expertise of prison and jail administrators in establishing necessary regulations and procedures to

16  maintain good order, security and discipline, consistent with consideration of costs and limited

17  resources."  Hartmann, 707 F.3d 1114 at 1124 (citations and internal quotation marks omitted).

18         Under RLUIPA, a burden is substantial if it is "'oppressive' to a 'significantly great'

19  extent.  That is, a 'substantial burden' on 'religious exercise' must impose a significantly great

20  restriction or onus upon such exercise."  Warsoldier v. Woodford, 418 F.3d 989, 995 (9th Cir.

21  2005) (quoting San Jose Christian College v. City of Morgan Hill, 360 F.3d 1024, 1034 (9th Cir.

22  2004)).  "In addition, the Supreme Court has found a substantial burden as 'where the state ...

23  denies [an important benefit] because of conduct mandated by religious belief, thereby putting

24  substantial pressure on an adherent to modify his behavior and to violate his beliefs.'  Although

25  such 'compulsion may be indirect, the infringement upon free exercise is nonetheless

26  substantial.'"  Warsoldier, 418 F.3d at 995 (quoting Thomas v. Review Board, 450 U.S. 707, 717-

27  18 (1981)).

28         Plaintiff bears the initial burden of demonstrating that the challenged policy constitutes a

46

1    "substantial burden on the exercise of his religious beliefs." Warsoldier, 418 F.3d at 994.  If

2    plaintiff meets his initial burden, then the burden shifts to the government. "Once the plaintiff

3    establishes that the challenged state action substantially burdens his religious exercise, the

4    government bears the burden of establishing that the regulation serves a compelling government

5    interest and is the least restrictive means of achieving that interest." Shakur, 514 F.3d at 889.

6         Defendant initially contends that his actions did not impose a substantial burden on the

7    exercise of plaintiff's religious beliefs.  Defendant argues that plaintiff is still able to practice

8    other aspects of his religion, even without participating in the RMAP, and that plaintiff is not

9    obligated to participate in the RMAP.  Hence, asserts defendant, neither the Giurbino

10   Memorandum nor "the mere existence of the RMAP" can be said to impose a substantial burden

11   on plaintiff's religious exercise.  Moreover, to the extent that plaintiff has chosen to participate in

12   the RMAP, defendant argues that plaintiff cannot complain that it provides only limited Halal

13   food, explaining that "the RMAP was never intended to provide halal vegetables or other foods."

14   In other words, according to defendant, the RMAP provides an opportunity for plaintiff to expand

15   the exercise of his religion.  Defendant does not address plaintiff's exclusion from the JKDP.

16        Defendant further contends that, should the court find a substantial burden on plaintiff's

17   religious exercise, the RMAP serves a compelling governmental interest through the least

18   restrictive means.  Defendant identifies the compelling governmental interest as "providing an

19   acceptable religious diet for all Muslim inmates in CDCR custody."  ECF No. 84 at 5.

20   Defendant asserts that "the RMAP is a generally nonrestrictive way of providing such a diet;

21   CDCR could have provided only the vegetarian diet (which complies with the tenets of Islam) but

22   instead chose to provide an option that allows Plaintiff and other Muslim inmates to eat halal

23   meat." Id.

24        In Shakur, the Court of Appeals decried the government's failure to submit an affidavit

25   "of an official specializing in food service or procurement," resulting in a record "which contains

26   no competent evidence as to the additional cost of providing Halal or kosher meat to ADOC's

27   Muslim prisoners." 514 F.3d at 889-90.  The court also found no evidence of actual inquiry into

28   the least restrictive alternatives.  The Ninth Circuit concluded that it was unable to address the

1  RLUIPA claim on the existing record, id. at 891:

2
3
> On this record, where there is factual dispute as to the extent of the burden on Shakur's religious activities, the extent of the burden that would be created by accommodating Shakur's request, and the existence of less restrictive alternatives, we cannot conclude that summary judgment on the RLUIPA claim was appropriate. The RLUIPA claim must be remanded.
4
5

6  Based on this court's findings that the record is inadequate to address plaintiff's Free

7  Exercise and Equal Protection claims, and because defendants' burden is even greater under

8  RLUIPA, it is recommended that defendant's motion for summary judgment on plaintiff's

9  RLUIPA claim also be denied due to the material factual disputes on this claim.

10      VI.    Conclusion

11  For the reasons set forth above, IT IS HEREBY RECOMMENDED that defendant's

12  motion for summary judgment, ECF No. 72, be granted in part and denied in part as follows:

13      1. GRANTED on plaintiff's claim under the Establishment Clause of the First

14  Amendment.

15      2. GRANTED on plaintiff's claims for money damages under the Free Exercise Clause of

16  the First Amendment, and the Equal Protection Clause of the Fourteenth Amendment.

17      3. DENIED on plaintiff's claims for declaratory and prospective injunctive relief under

18  the Free Exercise Clause of the First Amendment, the Equal Protection Clause of the Fourteenth

19  Amendment, and the Religious Land Use and Institutionalized Persons Act (RLUIPA), upon

20  which this action should proceed.

21  These findings and recommendations are submitted to the United States District Judge

22  assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

23  after being served with these findings and recommendations, any party may file written

24  objections with the court, which shall be captioned "Objections to Magistrate Judge's Findings

25  and Recommendations."  **No extensions of time will be granted, due to exigencies of time**

26  **within the court.**[21]  A copy of any objections filed with the court shall also be served on all

27  _____

28  [21]  Plaintiff is informed that in order to secure independent review by the district judge, and (continued…)

parties.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: September 9, 2015

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE

preserve issues for appeal, he need only identify the findings and recommendations to which he objects.  Extensive briefing is not necessary.